## ALLEN v. LOUISIANA HIGHWAY COMMIS-SION et al.
### No. 1189.

Court of Appeal of Louisiana. First Circuit.

Oct. 5, 1933.

L. L. Morgan, of Covington, and E. R. Stoker, of Baton Rouge, for appellants.

Cline, Plauche & Thompson, of Lake Charles, for appellee.

ELLIOTT, Judge.

Mrs. Helen Wingate Allen, widow of D. G. Allen, acting individually for herself, as widow, and also as natural tutrix of her children, Helen Caroline and Thomas Carroll Wingate Allen, both minors and issue of her marriage with D. G. Allen, deceased, claims of Louisiana highway commission and Union Indemnity Company, in solido, the sum of $6,000, payable in weekly installments at the rate of $20 per week, less $240 received. She also claims of them in the same way the further sum of $150 on account of funeral and contingent expenses, all under the Employers' Liability Act of this state (Act No. 20 of 1914 as amended), that the weekly payments commence with the week beginning December 4, 1931, and that each weekly installment bears 5 per cent. interest from maturity until paid.

She alleges: That her husband, the said Allen, was in the employ of the Louisiana highway commission as right of way agent. That his duty as such required him to obtain rights of way along the routes of highways being constructed and to be constructed by said highway commission. That on or about September 12, 1931, while her husband, while so employed and while performing services incidental to and arising out of his said employment and in the course of his employer's business and occupation, accidentally struck his right lower leg or shin against either a piece of broken concrete road culvert, pipe, or a a bush, causing an abrasion and contusion of

his said leg. That within a few days thereafter his leg became infected, as a result of said accident, necessitating the services of a physician. That said infection, continuing to grow worse, on or about September 21, 1931, it became necessary for him to go to a hospital. That he remained in the hospital until on or about October 26, 1931, when he was permitted to return home, although he had not recovered and was still suffering from the effects of said wound and infection resulting therefrom. That he continued to suffer, said wound did not heal, and he remained under the care of a physician, when on or about November 20, 1931, he began to grow rapidly worse. That on November 28, 1931, he was readmitted to the hospital and operated on to save his life, but on December 3, 1931, he died. That his death was due to a general infection, resulting from said leg infection, and to lowered resistance, resulting from said infection. That at the time he received said injury and at the time of his death the Union Indemnity Company was carrying the compensation insurance of the Louisiana highway commission, provided for by the Employers' Liability Act of this state. The Union Indemnity Company was therefore made a party defendant to the suit.

The defendants admit the employment of said Allen and that he was injured, while in the performance of his duty, but they deny the alleged result. They admit paying him compensation from September 12, 1931, to December 4, 1931, in amount $240, and allege that they also paid the further sum of $250 on account of his medical and hospital expenses. They deny all further liability. They allege that his death was caused by an acute, gangrenous, ruptured appendix and colon, with a general peritonitis, and deny that his condition and death resulted from or was in any way connected with the injury, which he sustained on September 12, 1931.

There was judgment in favor of the plaintiff as prayed for, and the defendants have appealed.

■ Defendants excepted to plaintiff's petition on the ground, that it set forth no right or cause of action. The exception was overruled. It is not urged in defendants' brief and is therefore looked on as abandoned.

The arguments and briefs of the parties show, that the questions about which they differ are whether the injury, which D. G. Allen received to his leg on or about September 12, 1931, resulted in a general infection, which the doctors speak of as a general septicemia, and, if the affirmative of that fact appears, then did this septicemia cause the appendicitis and diseased colon, which Allen was found to have, or, if not thereby caused, was a dormant condition of that kind thereby activated into the virulence, which was found to exist in that respect. Another question is whether Allen's resisting power

was so lowered by the infection that he was unable to stand the operation for appendicitis, or was his lowered resistance due solely to the ruptured appendix and colon, which was found to have taken place when the abdominal operation was performed.

It was agreed by the parties that J. H. Long, who was working with D. G. Allen at the time he was injured, if sworn, would testify: That Allen, while in the performance of his work, accidentally struck his right lower leg or shin against either a piece of broken concrete road culvert, a pipe, or brick, which caused an immediate abrasion and contusion of the shin. That Allen immediately raised the leg of his trousers, and Long saw, at the time, the abrasion and contusion, which resulted from the accident. That Allen continued to work for several hours thereafter but several times complained that the wound pained him; that the next day Allen again complained to Long about the injury and showed it to him. It was then several inches around and had grown red and the leg was swollen. That on September 13th or 14th Allen had to discontinue his work on account of the increasing soreness of his leg, resulting from the wound and the continuing pain he was suffering therefrom.

Mrs. Allen, the plaintiff, testifies that he complained to her of suffering on account of the injury the night of September 12th after he came home; that the contusion was then swollen, hot, red, and about 3 inches long; that she treated it, but it continued to extend and grow worse, and after about four days she took him in an automobile to Dr. Reid. She further testified that he suffered continuously with his leg from the time when she first saw it until his death.

Dr. Reid testifies: That D. G. Allen was brought to his office with a leg injury on September 17, 1931, and that he treated him continuously from that time until December 3, 1931, when he died. That the injury consisted of an abrasion and contusion of the right leg middle third, that he treated it daily, but the wound, being infected and not responding to office treatment, on September 21, 1931, he admitted him to the hospital at Leesville and operated on his leg. That the covering of the bone or periosteum was so bad that he had to have a general anæsthetic. That all necrotic tissue and diseased periosteum was removed, and that the wound was dressed daily and intravenous treatment given for the infection. That Allen remained in the hospital until October 26, 1931. That he improved slowly after the operation, suffering a great deal with aches and pains throughout his body, especially his leg. After the operation his temperature subsided some. Then on November 20th he developed more temperature, was nauseated, with general pain and especially of the abdomen. He could not eat anything without it nauseat-

ing him more. On November 27th he was readmitted to the hospital, suffering at that time with great pain in the lower abdomen, especially in the right iliac region, suffering at all times with his leg. That he knew then from physical findings and general examination that he had some trouble with or about the appendix, and on November 28, 1931, operated on him for that trouble. That upon opening the abdomen he found that the appendix and colon had both ruptured and the abdomen full of a sero-fibrous fluid and a mass of adhesions of the appendix and adjacent parts. That the mass taken from the stomach was found to be a general infection, not malignant. The patient reacted from the anæsthetic and operation very badly, improved very slowly for two days, suffering great pains at all times with his abdomen and leg and general pains. That he just gradually grew worse until December 3, 1931, when he died.

Physicians called by the defendants and asked to state their opinions as to the cause of death, based on hypothetical questions, assumed that Dr. Reid had discharged Allen from the hospital after operating on his leg, and that Allen at that time had no temperature and was able to walk to the office of the physician to have his leg dressed. They expressed the further opinion that there was no general septicemia, but that, even if such existed, as the result of a leg injury, the same would have no bearing on nor connection with the subsequent appendicitis and diseased colon; that Allen's death was due solely and entirely to the delay to operate after the appendicitis had manifested itself until after the rupture had occurred, with resulting peritonitis.

Due to its bearing on this contention, we quote the testimony of Dr. Reid as follows:

"Q. Doctor between October 26th, 1931, when he was permitted to return home, and November 20th, 1931, when he had the first appendicitis attack, did he improve any? A. Very little, there was very little improvement from the time he left, and he shouldn't have left and I advised him not to at that time but he felt that he had better go, and that, being better satisfied, he would improve; but he was running a little temperature at all times and would return to the hospital to have his leg treated and dressed and three or four days preceding his second admittance to the hospital he was a very sick man, continually complaining of pain both in his leg and abdomen and, being nauseated, asking if I couldn't give him something to settle his stomach so he could eat. He was starving to death and asking if I couldn't give him something so he could sleep. He was losing so much sleep."

Further questioned, he says that he figured, that the wound was infected on September 21st, when Allen first came to his office;

that he just put him on a treatment, because he did not want to open it until he was sure of it; that Allen came to see him every day after September 17th and sometimes twice a day; that he suffered great pain in his leg all the time; that the irritated condition around the wound grew worse and spread; that from September 21st to October 26th he saw him night and day; that after he left the hospital on October 26th he treated him every day; that Allen's wife or brother-in-law would bring him to his office in a car for the purpose. He was on crutches the first few times after he left the hospital and the last two times he was brought in by two men. He could not walk.

As for walking to his office, Dr. Reid said: That, following the operation on his leg, Allen's wife brought him back to the office in a car and he believed he walked from the car to the office, but he was on crutches and complained of his leg considerably. The distance he walked is not stated. That, when Allen left the hospital to go home, he complained of pain, and he advised him not to go, but he insisted on going, thinking it would help him, to go home. He was worn out staying there, but his leg had not healed and had to be dressed every day.

Dr. Reid gave it as his opinion, based on his study of the case, that from September 21st Allen was suffering from a general infection, caused by his leg; that the primary focus was in his leg and was caused by the wound on his leg; that his subsequent abdominal infection was due to the lowering of his physical resistance and resulted from the primary infection in his leg; that the leg infection infected the blood stream and, assisted by his lowered resistance, reached and infected the appendix and colon. The testimony of Dr. Reid was taken on April 30, 1932.

The testimony of two physicians was taken by the defendants de bene esse on May 28, 1932. These physicians had not seen nor treated the decedent, and it does not appear, from the questions propounded to them and their answers thereto, that either of them had read the testimony of Dr. Reid.

Hypothetical questions were propounded to them, based on an assumed state of facts. Their opinions seem to be based on an understanding on their part that, following the leg operation, Allen had ceased to have temperature, which was contrary to the facts, as testified to by Dr. Reid, who says, that his temperature never left him from the time he was admitted into the hospital on September 21st until his death some two months later. The opinion of these physicians is also apparently based on the understanding on their part that Dr. Reid had discharged Allen from the hospital at the time that he went home, and that he went home on that account. And they seem to have further understood, from the fact that he went home,

that the infection had subsided, whereas Dr. Reid testified that he advised him not to go home and that he had temperature at the time he left the hospital and continued to have it until his death. The existence of a general septicemia after September 21, 1931, in the condition of Allen, as testified to by Dr. Reid, is supported by the opinions of Dr. J. G. Martin and Dr. A. S. Reisor, and that fact to our mind is established, and there is no need for saying more on that subject.

Other questions are more perplexing. It is necessary for us to weigh the conflicting opinions of physicians, and in this case it does not appear to us that the opinions of the physicians, called by the defendants, based on hypothetical questions only, entertained a proper appreciation of the facts as testified to by Dr. Reid.

"Testimony in the shape of inferences and conclusions rests always on certain premises of fact. That which has been called observation serving as the basis of belief in matters directly cognizable by the senses as the facts of an affray, a conversation, a trespass and the like is here replaced by what may be called a consideration of the premises. Just as observation of the situation or affair or surroundings is in one case essential to the formation of a witness's belief based on his senses, so a consideration of specific data is essential to the formation of an inference or conclusion or opinion. If the witness has not considered or had in mind these premises, his inference or opinion is good for nothing etc." Wigmore on Evidence, vol. 1, subject, "Hypothetical Questions," § 672, p. 767 et seq.

When the trial was taken up in open court on October 12, 1932, the testimony of Dr. Reid and that of Drs. Menendez and E. Denegre Martin was presumably in the record and available for reading. The plaintiff then called two local physicians and obtained their opinions concerning the cause of Allen's death and as to what connection and bearing, if any, the general infection had on the appendix and colon. These two local physicians testified that they had read the testimony of Dr. Reid, but it does not appear whether they had read the testimony of the two physicians, residing in New Orleans, or not. The two local physicians, called by the plaintiff, answering the hypothetical questions propounded to them, substantially agreed with the opinion of Dr. Reid and concurred with him in all his conclusions.

The defendants then called three local physicians, and they substantially agreed with the two in New Orleans. One of the local physicians, called by the defendants, Dr. Watkins, had evidently read the testimony of Dr. Reid, but it does not appear whether the other two had done so or not. Neither does it appear whether they had read the testimony of Drs. Menendez and E. Denegre Martin, which had been previously taken in New Orleans.

In connection with our observations heretofore made, concerning the answers of Drs. Menendez and E. Denegre Martin to the questions propounded to them, we copy some of the questions propounded to Dr. Goldsmith and his answers thereto, as indicating his understanding of the facts testified to by Dr. Reid. The other two local physicians, called by the defendants, seem to have understood the testimony of Dr. Reid practically as it was understood by Dr. Goldsmith. We do not mean, that the physicians, called by the defendants, were all asked the questions that were asked Dr. Goldsmith, nor that they gave the same answers, but they all reached the same conclusion, which had been reached by the physicians in New Orleans.

"Q. If Mr. Allen had an infection in his leg after September 21st, considering the history of the case thereafter, as you understand it, what is your opinion as to whether or not that infection could have had any bearing on the appendicitis? A. In this case, with the individual going to the doctor's office for dressings, showing that the infection of the leg had completely subsided, I can't see how the infection of the leg could have any bearing on the acute attack of appendicitis.

"By the court: Q. Suppose there was a general poisoning of the blood stream at that time? A. If so, he would be running temperature, sweats, etc. and I don't think the doctor would allow him to come to his office.

"Q. Let's suppose he did. A. I can't see it * * * If he had septicemia, with a bacteremia very remotely possible, it could cause appendicitis but I think it would cause abscesses elsewhere in the body much quicker where the arteries are much smaller than in the appendix."

He was afterwards asked:

"Q. Wouldn't you be in a better position if you observed him yourself? A. If he had those symptoms, which no mention is made of, a man coming to the office, walking to the office, having dressings, I wouldn't see where he had any general infection with no temperature.

"Q. Who related that he walked to the office? A. The statement that I thought I heard this morning.

"Q. Who related that he did not have any temperature? A. If a doctor was dressing a leg and having a man coming to the office, I wasn't supposing he would have temperature.

"Q. You are just supposing that? A. Yes.

"Q. In other words you are not answering from the hypothetical state of facts that were related to you? A. Yes."

If the physicians called by the defendants

had predicated their opinions exclusively on the facts testified to by Dr. Reid, without turning from conditions which he says existed, and had not assumed as true, matters inconsistent with what he claims were the facts, they might have reached a different conclusion. To properly appreciate the situation as a basis for their opinion, it was necessary for them to take as true, the facts testified to by Dr. Reid. He had examined plaintiff's husband soon after he was injured. He is the only physician who had done so, the only one to treat him, the only one to operate on his leg, the only one who saw the symptoms of septicemia and of appendicitis, and the only one who operated on that account. His testimony deals with the facts concerning the appearance of the injured leg, the spread of the infection, the subsequent abdominal trouble, and the condition and situation of her husband from the time he first saw him until his death. His opinion is based on knowledge of the facts as they appeared and developed from day to day. His opinion is therefore entitled to great weight, but he might be mistaken in his opinion. The opinion of each of the other physicians has been given the weight it is due, according to our appreciation of the same.

There is one matter not based on hypothetical questions as to which the physicians called by the plaintiff and those called by the defendants differ, which requires our action. Dr. Menendez was asked the following questions:

"Q. Doctor is there any possibility of an appendicitis developing from an infected leg return circulation? A. No.

"Q. Will you explain why? A. Because the return circulation of the leg naturally is by and through the veins. The veins of the leg drain upwards and are tributaries of the inferior vena cava, which travels upwards to the heart, while the venous return or circulation of the appendix is by way of the mesentery portal system to and through the liver, draining into the superior vena cava and into the heart. Therefore the venous return circulation of the leg and the appendix are separate and distinct."

Dr. E. Denegre Martin of New Orleans, Drs. Watkins, White, and Goldsmith were practically of the same opinion on this subject as Dr. Menendez. Dr. Reid, however, with whom agreed Drs. J. G. Martin and A. S. Reisor, held that the appendix could be infected by a general septicemia, and that a dormant condition of the appendix and colon could be awakened and aroused into activity as the result of lowered resistance brought about by septicemia.

In Arender v. Grant Timber Co., Inc., 9 La. App. 132, 119 So. 498, it was held that the opinion of the physician who had personally attended the deceased and knew his condition from first-hand information is entitled to more weight than the opinions of those who never saw him. In this case we adopt the opinion of Dr. Reid, supported by two other physicians, as the proper one for our guidance in this matter, and follow it accordingly.

■ The evidence shows that Dr. Reid delayed the operation for appendicitis for about eight days after discovering the symptoms, which indicated an acute attack of that kind, with the result that, when he operated on account of that trouble, the appendix and colon had both ruptured. Peritonitis had set in, and there is opinion testimony to the effect that Dr. Reid should not have delayed the operation; that, if it had been timely performed, the rupture and resulting peritonitis, which was the immediate cause of his death, would have been averted, and, even though septicemia or a general infection existed and had reached the blood stream, that did not necessarily mean that Allen would not have recovered and that he might have done so. Dr. Reid explained his delay to operate for appendicitis. In one place he says:

"Q. On November 20th, when he complained to you, was that accompanied by the usual symptoms, that indicate appendicitis, such as nausea, temperature and so forth? A. It did. It occurred to me that it was appendicitis, but his general condition, his abdominal condition, was so clouded by the infection, that he had, it was hard to determine."

In another he said: "He had very strong symptoms of appendicitis before I operated. Had he not had this general infection, I would have operated on Mr. Allen before I did, however, the symptoms he had of appendicitis could also be the symptoms of his primary infection, septicemia; that's why I re-admitted him to the hospital for close examination, and that is why I was not sure at the time I operated, that he had appendicitis. However, I knew, that he had some trouble in the abdominal cavity, that required surgery. He was growing worse fast."

In another: "No I believe the man would have gotten well from the septicemia, if he hadn't developed the secondary infection, and I believe, that he would have gotten well from the appendicitis, if he hadn't had the primary condition."

Dr. J. G. Martin and Dr. Reisor, asked to express opinions as to whether or not such a delay was advisable, thought that circumstances might justify it; that, without better information, they were not disposed to pass judgment on the matter. The preponderance of opinion, however, is to the effect that there should have been no delay, such as occurred, in operating for the appendicitis. It does not follow from this, however,

that plaintiffs have no right to recover, simply because of the delay, when the physician, having personal charge of the case and first-hand information as to the condition of the patient, felt that the delay was advisable, and the opposing opinions are based on hypothetical questions, put to physicians, who never saw the patient. Such a difference in opinion is not ground for defeating a claim for compensation, when no other nor further reason therefor exists.

One of the physicians, who expressed an opinion at the instance of the defendants, was asked:

"Q. Had you seen the man every day, during two months, observed his symptoms, his condition, and operated upon him and had yourself seen his internal organs, do you not consider, that you would have been in a better position to diagnose correctly what was the cause of the death than you are from hypothetical questions? A. Yes."

██ A physician, who expressed an opinion at the instance of the defendants was in the employment and pay of one of the defendants. The law provides: "The circumstances of the witness being * * * in the actual service or salary of the parties, is not a sufficient cause to consider the witness as incompetent, but may, according to circumstances, diminish the extent of his credibility." C. C. art. 2282. If being in the actual service or salary of one of the parties is sufficient to diminish his credibility when testifying to matters of fact, the diminishment must be far greater when such witness is called on to express an opinion based on hypothetical questions.

We copy from Greenleaf, vol. 1, pt. 3, subject, "Examination of Witnesses," § 440b: "In weighing the testimony of biased witness, however, a distinction is to be observed between matters of opinion and matters of fact. Such a witness, it is said, is to be distrusted, when he speaks to matters of opinion; but in matters of fact, his testimony is to receive a degree of credit in proportion to the probability of the transaction, the absence or extent of contributory proof and the general tone of his evidence."

██ In Henderson v. Louisiana Power Company, 9 La. App. 475, 121 So. 217, 218, the court says: "And in so far as the expert testimony went, we think it established that pneumonia had caused death, and there were not any other complications; however, all of the physicians agreed the fever which developed in the afternoon following the injury was the result of the blow, and the evidence establishes that the illness continued until death, and, considering this fact with the facts first above stated, the presumption is that the injury caused the illness or aroused the disease resulting in death, and defendant is liable."

In Blackman v. Hope Engineering & Supply Co., 11 La. App. 92, 120 So. 682, 683, the court said: "In compensation cases it is immaterial whether the continued disability directly resulted from the injury or from a condition resulting from the injury, or whether the injury was the sole cause or merely a contributing cause."

Having considered and taken into account all the evidence in the record on the subject, it is our conclusion that the accidental injury which plaintiff's husband received on September 12, 1931, to his lower leg or shin, while performing service for Louisiana highway commission, arising out of and incidental to his employment, in the course of his employer's trade, business, or occupation, is indirectly responsible and a causative factor, leading to and bringing about the death of plaintiff's husband, and that she is therefore entitled to the compensation claimed.

The judgment appealed from is in our opinion correct. Judgment affirmed; defendants and appellants to pay the cost in both courts.