On April 16, 1938, Clyde Scott was employed by the Baton Rouge Water Works Company, and while in the course and scope of his employment, in the act of screwing up water pipes, he was accidently struck by a pipe wrench, which slipped and struck him on his left arm, jerking his left arm out of place at his shoulder. As a result of the accident and injury he suffered much pain and was totally disabled from continuing with his work. It appears that the insurer of the Water Works Company paid him compensation at the rate of 65% of his wages, to-wit: $9.36 per week, from April 16 to June 10, 1938, and also from February 18, 1939, to August 24, 1939. On August 30, 1939, Clyde Scott died of peritonitis after an operation for a ruptured appendix.
The plaintiff herein sues the Baton Rouge Water Works and its insurer for herself, individually, as the surviving widow of Clyde Scott, and as natural tutrix of Louise Scott, aged seven, and Clyde Scott, Jr., aged four, the surviving minor children of her marriage with Clyde Scott. She alleges that the injury received by her husband on April 16, 1938, resulted in causing infection and general weakening of his whole system and thereby was the direct cause of his developing appendicitis and the subsequent rupture of his appendix, which necessitated the operation, which, in turn, proved fatal; that his death is therefore attributable directly to his aforesaid injury. She also alleges that no compensation was paid to her husband for the period from June 10, 1938, until February 18, 1939, or a total of 34 weeks, at the rate of $9.36 per week, which amount is due and payable to her, with 5% interest from due date until paid. She also alleges that the reasonable expenses of the burial was the sum of $150, and the hospital and medical bills of his last illness amounted to $174.25, which have not been paid. She prays for compensation at the rate of 65% of the weekly wage of the deceased, less the compensation heretofore paid him, plus the 34 weeks not paid, plus medical and funeral expenses.
The defendant first filed a plea of prescription, which later was overruled by the Court on their request. They thereafter filed their answer, admitting the employment *Page 529 
and the accident of Clyde Scott, as alleged, and admitting also that compensation was paid by the insurer for a time, and that thereafter said payments were discontinued, and that after a certain intervening time, such payments were resumed. They deny, however, that the injury sustained by plaintiff in his accident was the cause of his death, contending, in effect, that his death resulted from an appendectomy which had nothing to do with the accidental injury, and they deny all liability on account of the death of Clyde Scott.
After hearing the case, the District Court, for reasons orally assigned, rendered judgment in favor of the defendants, rejecting plaintiff's demand. Plaintiff has appealed.
We summarize the testimony of the various witnesses in the order in which they testified, as follows:
R.F. Walker, attorney at law, testified that he was employed by Clyde Scott in December, 1938, to represent him in his claim for compensation and that as a result of correspondence with the employer and insurer, Scott was sent to New Orleans for examination in January, 1939, and that on February 18, 1939, they began paying Scott compensation (which apparently had been discontinued June 10, 1938), and continued the compensation payments until August 28, 1939; that the August 28th check was never cashed because Clyde Scott died on August 30th, before endorsing it, and subsequently it was returned to the insurers on their request. After the introduction of this testimony with reference to the last check, counsel for defendants stated that he now made a tender of two weeks' compensation, in order to be sure to cover the amount due that was not paid from the date of the last payment until the time of Scott's death. Mr. Walker also testified that from his personal observation of Clyde Scott, when he called at his office, he knew that Scott was suffering from an injury to his shoulder, and that he could hardly use his arm at all and that it gradually grew worse until the shoulder looked like "it was hanging on a stick, without any arm or shoulder in it at all".
Teddy Roosevelt Cooper testified to the actual happening of the accident, stating that he was working with Clyde Scott and that he and Scott were pulling on a Stillson wrench, when it slipped and jerked and injured Clyde Scott's left shoulder; that at the time of the accident he did not think the injury would amount to very much, but that afterwards Scott got gradually worse and that he became disabled to the point that he could do little but go backward and forward to the hospital.
Rosa Brown testified that Clyde Scott and his wife came to live with her in 1939, and that he stayed there until three weeks before he died; that the evening Clyde got hurt he came over to her house and complained about his painful injury, and that thereafter he received medical treatment and, in effect, that his arm and shoulder got worse and that he lost his appetite, complained of his arm and stomach hurting him all the time and had weak spells with fever; that prior to his injury he was never sick, and that subsequently thereto he did not work and was unable to do so.
Dr. W.H. Pipes testified that on October 20, 1938, he examined Clyde Scott at the request of Mr. Walker and that he found that the left shoulder and arm were atrophied and that there were abnormal sensations in the left arm, — numbness or lack of sensation in the little finger and the ring finger; that the arm and shoulder were definitely atrophied, which he ascribes to damage to the nerves constituting the brachial plexis. Dr. Pipe further testified that the injury to Scott's arm, "which seemed to be permanent, and was progressive in its effect, which was exhausting and weakening his vital resources, was a definite factor in his not being able to recover from this attack of appendicitis and operation". He testified further that Scott's lack of resistance would tend to let the appendix go on to rupture rather than running two or three days and clearing up, as a great many do, and that "his weakened condition and lack of vitality was a strong factor of his being overcome and giving away to this abnormal condition". Dr. Pipes in being cross examined with reference to the failure and refusal of Clyde Scott to cooperate and follow advice with reference to exercises in the use of his injured arm and shoulder expressed the opinion that no treatment could have done him any good, except nerve surgery. He admitted, on cross examination, that Clyde Scott might have developed appendicitis and died under the same circumstances under which he did die even if he had had no injury, and maintained that Scott's condition resulting from his injury was a strong contributing factor in his death, although he could not say it was thoroughly responsible. *Page 530 
Dr. H.W. Lee testified that he was called to the bedside of Clyde Scott in the latter part of August, 1939, and that he found him suffering with what he thought was a ruptured appendix and advised immediate operation, and that the next day he did operate, assisted by Dr. Charles H. Voss, and found a severely ruptured appendix, which resulted in Scott's death; that on the occasion of his professional visit, he did not pay much attention to the injured shoulder and arm, but he did notice that there was some atrophy there and that Scott did not have good use of his arm. He testified that he thought a dormant condition of the appendix could be brought about by lowered resistance. But in his answer to the question: "The fact that Clyde Scott, as has been testified, gradually grew weaker and weaker, would that not have a tendency to weaken his appendix?" he states as follows: "No, Sir, I do not think so; I do not think that would weaken the appendix at all". He testified, in effect, that in his opinion plaintiff's weakened condition did not make him more susceptible to an attack of appendicitis, but that his lowered resistance lessened his chances of recovery from an operation for appendicitis. He testified further that 25 to 30 per cent. of patients with ruptured appendices die and about one-half to one per cent of patients having just acute appendices without rupture die. He also testified that he could not say that the weakened condition of Clyde Scott indirectly affected his death.
Dr. Charles H. Voss testified, in effect, that Scott's long period of illness reduced his ability to withstand the operation, but that he could not make the statement that his period of illness weakened the appendix, nor could he say that Scott would have recovered from the ruptured appendix had he been in the same condition he was prior to his accident; that only God would know that.
O.C. Miller testified that he saw Clyde Scott during the latter part of 1938; that he roomed in the same rooming house with him; that he noticed Scott's injury; that Scott did not seem to have any use for his arm, which appeared to be crumbling, nor did he have much use of his fingers.
Louisiana McCoy Scott testified that she was the wife of Clyde Scott; that they were never separated; that after the accident he had no use at all of his arm; that he suffered much and that he did not sleep night or day.
John Morgan, brother-in-law of Clyde Scott, testified that he knew Clyde Scott since 1907; that prior to his accident he was all right; that he never knew of his being sick; and that subsequent to his accident his left arm became useless and shriveled.
W.H. Powers testified, in his capacity as steamfitter and plumber, with reference to his experience in the use of Stillson wrenches, and his testimony is not very material.
Lizzie McCoy testified with reference to the injury very much to the same effect as her sister, Louisiana Scott, the plaintiff.
The plaintiff, on recall, testified that the hospital bill was $74.25, and funeral expense, $150.
L.C. Eldridge testified that he is the superintendent of the distribution system of the Baton Rouge Water Works, and that Clyde Scott had worked under him; that at the time Scott had his accident, the attending physician was Dr. Witter and that Dr. Witter advised him to return to work some time after the accident and that he, as superintendent, was willing to re-engage him for light duty as ordered by the doctor, but that Scott failed to show up; that he saw Scott several times thereafter and that Scott appeared to be in reasonably good health; that he advised him that he could return to work at any time, but that he did not want to. On cross examination, this witness admitted that he did not examine Scott's arm and shoulder.
Dr. Howard Witter testified that he first saw Clyde Scott on April 18, 1938; that at that time he was complaining of pain and stiffness in the left shoulder; that "on physical examination, aside from the shoulder, everything was completely negative, but on that shoulder there was no swelling, but it was slightly tender over the region of the deltoid muscle, right here at the top of the shoulder. On moving his arm he stated he could not move his arm, but by moving it gently, passive motion, I could move it in any direction that anyone wanted to. At that time there was an X-ray taken and there was no evidence of dislocation or fracture". He states that he continued to see Scott at intervals up to June 20, 1938, and that the first of June he thought that using the arm would help to limber up the shoulder joint and that he advised him to return to work for light duty, but that he was informed that he never reported; that on June 20 he had a slight atrophy of the *Page 531 
deltoid muscle and the posterior shoulder muscle, and at that time, on Scott's request, he referred him to the Charity Hospital, and did not see him again until February 20, 1939. He states that on the latter date examination of the shoulder showed marked atrophy of the deltoid muscle and muscles of the posterior shoulder girdle, which, to him, meant that at the time of the injury, Scott probably had a nerve injury; that the diagnosis at that time was traumatic arthritis and nerve injury. Dr. Witter states further that he baked the arm regularly from February, 1939, to July 31, 1939, after which he never returned for any treatment. He states that Scott did not cooperate, especially with reference to exercising the arm, and that in his opinion he exaggerated his condition; that up to the last date he saw him, Scott's only complaint was pain in his left shoulder and that at that time he was not emaciated and did not complain of nausea. He states the last time he saw him in July, 1939, Scott was in excellent condition for an operation for appendicitis.
Dr. T. Jeff McHugh testified that he examined Clyde Scott on January 16, 1939, and that the examination revealed a fairly well nourished and developed individual, with the left shoulder less rounded than the right, and showing some deltoid atrophy, and the left arm slightly smaller than the right, and the left hand slightly colder to touch than the right. He concluded that since there were no diagnostic evidence of rupture to the tendon of the joint and no clinical evidence of fracture, it was probable he had periarthritis of the left shoulder; that this condition is usually prolonged, but recovery is the rule by deep massage and moderate use of the joint. He stated that he could see absolutely no connection between the death resulting from the appendectomy and the condition he found on January 16, 1939, in his examination of Scott; that at the time of this examination he felt that Scott could not do hard manual labor, but could do light work.
This case presents a borderline case. We grant that in Allen v. Louisiana Highway Commission, La.App., 150 So. 98, we granted compensation to plaintiff, while it was shown that plaintiff's husband had been operated on for appendicitis and died as the result of the operation. In that case Mr. Allen never did get over the effect of the accident, his leg becoming infected, which infection spread all over his system. He developed fever and kept the fever until he died. It was the combination of the infection and fever and the appendectomy which eventually killed him. There was testimony also to the effect that his condition was due to the lowering of his physical resistance and was the result of the primary infection of his leg; that the leg infection infected the blood stream and, assisted by his lowered resistance, reached and infected the appendix and colon. We have no such testimony in this case. It is not shown that Scott suffered with any infection of his blood stream.
In the case at bar, the evidence preponderates that Scott received an accident causing an involvement or injury to the nerves affecting his left shoulder and arm, and not his entire system as was the case in Allen v. Louisiana Highway Commission, supra, and that case is not applicable herein. We are of the conclusion therefore that there is no causal connection between the injury received by him and the cause of his death and that therefore plaintiff cannot recover for his death.
However, plaintiff is entitled to recover for that period between June 10, 1938, and February 18, 1939, admittedly thirty-four weeks.
There is no evidence justifying defendant from not paying compensation for the period from June 10, 1938, when they ceased the payment of compensation, to February 18, 1939, when they resumed the compensation. According to the testimony of Mr. Eldridge, defendant's superintendent, he offered Scott "light work", in June, 1938, thereby admitting that Scott was unable to follow his former occupation of hard manual labor. Dr. Witter, defendant's doctor, testified, as noted supra, that on June 20, 1938, Scott had not fully recovered from his injury and on the request of Scott, he referred him to the Charity Hospital at New Orleans. It is significant to note that Witter states that on February 20, 1939, Scott was suffering, at that time, from a marked atrophy of the deltoid muscle and muscles of the posterior shoulder girdle, which to him meant that by the accident Scott received a nerve injury.
As to the last two weeks of compensation, defendants admit that they owe plaintiff that amount, and tendered the amount in open court, which was refused. *Page 532 
For these reasons, it is ordered that the judgment be reversed, annulled and set aside, and it is now ordered, adjudged and decreed that there be judgment herein in favor of Louisiana McCoy Scott, individually, and as natural tutrix of her minors, Louise and Clyde Scott, in the sum of $9.36 per week, from June 10, 1938, to February 18, 1939, or thirty-four weeks, with 5% interest per annum thereon, on each weekly payment, until paid, and further judgment in favor of plaintiff as aforesaid for the sum of $9.36 per week for the two last weeks prior to decedent's death, without interest, and against the defendants Baton Rouge Water Works Company and American Mutual Liability Insurance Company, in solido, with all costs of these proceedings.