The plaintiff brought this suit in her own behalf and in behalf of her three minor children to recover compensation at the rate of $20 per week for a period of 300 weeks, less the sum of $40 compensation paid, and plus funeral expenses of $150. She made her deceased husband's employer, the Dixie Drilling Company, and its insurance carrier, Associated Indemnity Corporation, parties to the suit. An exception to the jurisdiction of the court ratione personae was filed by the Drilling Company, which exception was sustained by the court, and that defendant has passed out of the case.
Plaintiff alleges in her petition that her husband, Charles F. Barnes, sustained an injury in October, 1944, while working as a roughneck for the said Drilling Company; that a piece of steel broke loose from a piece of metal on which he was hammering and pierced the chest of her deceased husband; that said piece of steel was removed by an operation on the following day; that as a result of the injury her deceased husband suffered continuous pain in his chest and left side; that he continued to grow weaker until on January 8, 1945, he underwent a second operation which resulted in his death because of his weakened and emaciated condition resulting from said injury.
The insurance company admits that deceased was injured when a small piece of steel was driven into the soft tissue of his left side, but alleged that the piece of steel did not penetrate the abdominal cavity of the deceased, and was only a minor injury from which the deceased recovered in a few days. It is admitted in the answer that a second operation was performed on the deceased about January 8, 1945, and that the deceased died on or about January 18, 1945. The defendant further alleges in its answer that at the end of two weeks from the said accident, the deceased had entirely recovered therefrom, and his death was not caused, hastened or contributed to by the accident.
After a trial, the trial judge rendered a judgment rejecting plaintiff's demands from which judgment this appeal is taken.
Stated in brief form, the plaintiff claims that her husband's death was caused in the following manner: that the sliver of steel penetrated the breast of the deceased just below his heart; that after the piece of steel was removed the following day, her deceased husband began to have fever; that pus came from the wound three or four days after the piece of steel was removed and continued to run pus for about three weeks; that the deceased lost appetite, was thirsty, developed a cough and lost weight; that he was nauseated a good part of the time and turned a pale and yellow color and complained of pain in his chest. Around the 7th of January, 1945, the decease became seriously ill and was taken to the hospital where he was operated on for appendicitis, which operation a few days later resulted in peritonitis and which caused his death on January 18, 1945. Plaintiff's claim is based on the theory that the wound from the steel caused plaintiff to contract pleurisy or some pus formation in his body, which in turn caused the appendicitis to develop, and because of his weakened condition, the deceased was unable to throw off the germs which brought on the peritonitis after the appendectomy.
[1] It is evident from the position of plaintiff in this matter that she bears the burden of showing by a fair preponderance of the evidence that the death of her husband had a causal connection with the injury. Nine doctors and several lay witnesses *Page 294 
testified in the case, and there is much conflict in the testimony and opinions of these witnesses. A discussion of the testimony of each witness would render this opinion too long, and we must confine our discussion to some of the most important facts and opinions which we believe are established by a preponderance of the evidence.
A particle of steel did penetrate the left side of the deceased, and this piece of steel was removed by the employer's physician the following day, the physician using a local anesthetic. The size of this piece of steel varies in the evidence from about half the size of the nail on the little finger to the point of a .22 caliber bullet. The point of the penetration of the piece of steel also varies in the evidence from the upper left of the abdomen and about one and a half inches from the sternum to about an inch below the heart. The exact point where the piece of steel penetrated the body of the deceased is rather important as it is claimed that the wound caused some inflammation of the pleura, resulting in the formation of pus and a condition of pleurisy. Dr. Frazar who removed the piece of steel testified that it did not go through the rectus muscle and did not penetrate the abdominal cavity. The decided preponderance of the medical opinion is to the effect that unless the metal penetrated the abdominal cavity, the wound could not cause traumatic pleurisy, and several of the doctors expressed the opinion that the wound was too low on the body to penetrate the pleura.
Mrs. Barnes testified that her deceased husband began to have fever a few days after the piece of steel was removed; that she saw pus come out of the wound three or four days after the piece of steel was removed and pus continued to come out of the wound for some three weeks; that her husband lost appetite, developed a cough, complained of pain in his chest, turned a yellow and pale color, lost weight, and began having vomiting spells about two weeks after the injury. The deceased went back to work two or three weeks after the accident and injury and worked for six days. His widow testified that he could not hold out at the work and was compelled to quit. There is some other lay testimony to the effect that the deceased was disabled and complained of pain for several weeks after the piece of steel was removed from his side. So far as the record shows, the deceased had had no previous disease which incapacitated him from work.
It is not disputed that about January 7, 1945, a little over two and one half months from the date of the injury, the deceased was stricken with an attack of appendicitis; that he was taken to a hospital at DeRidder and was operated on the next day by either Dr. Frazar and Dr. Roberts or by Dr. Roberts and Dr. Marcello, the evidence not being very clear as to which doctor assisted Dr. Roberts in the operation. It is clear, however, that the deceased had a ruptured and gangrenous appendix, and after the operation peritonitis set up, resulting in the death of the deceased on January 18, 1945, ten days after the operation for the ruptured appendix.
Conceding that the evidence shows that the injury which the deceased received caused a kind of traumatic pleurisy to develop, or caused the formation of pus in the wound, the next and most serious question in the case is whether or not this condition caused or contributed to the diseased condition of the appendix. If the injury caused or contributed to the appendectomy, it is clear that the injury had a causal connection with the death of the deceased, as it is conceded that his death was caused by purulent peritonitis which was a direct result of the operation for appendicitis.
Practically all of the doctors state that appendicitis can be caused by infection from the throat, tonsils, gall bladder, or from pus formations in other parts of the body. It is apparent that the deceased had a diseased appendix for some time before he was operated on in January, 1945, as his appendix was gangrenous and partly ruptured at that time. In fact, some of the doctors were of the opinion that the deceased had chronic appendicitis which was the cause of his trouble.
Dr. Reid examined the deceased on November 20, 1944, a little more than a month after the injury, and made an x-ray of his *Page 295 
chest at that time. As Dr. Reid is the doctor on whose testimony plaintiff largely relies, it is proper to give a brief summary of his opinion. He said that at the time he examined deceased he had a post operative scar about one inch long on the lower part of the sternum and complained of pain and tenderness in that area on manipulation. The doctor thought the deceased had a plastic pleurisy, but he did not detect any effusion or discharge of pus; that the x-ray showed a hazy condition on the lower part of the left lung. The doctor did not see how deep the wound was, but thought that it could have caused the pleurisy, and he further stated that the lowered resistance from the injury might have kept the deceased from overcoming the effects of the operation for a ruptured appendix. The doctor did not know what caused the appendicitis, but did state that it could have been caused by an infection and lowered resistance.
[2, 3] Dr. Reid did not see any infection in the wound or evidences of pus when he examined plaintiff a little more than a month after the injury. While the medical evidence shows that appendicitis can be caused by infection in the blood stream, there is no clear evidence in this case that there was infection in the blood stream of the deceased resulting from the wound. There is a conflict in the opinions of the doctors as to whether or not lowered resistance will cause appendicitis or affect the chance of recovery from peritonitis. The most that can be said in favor of plaintiff's proof that the appendicitis had a causal connection with the injury of deceased is that the injury caused a traumatic pleurisy, or pus formation, and that this infection could have, or probably did,
cause the appendicitis. Of course, we are not justified in rendering a judgment in favor of plaintiff where one of the links in her chain of causation is based on a probability and not a legal certainty.
Learned counsel for plaintiff relies largely on the case of Allen v. Louisiana Highway Commission et al., La. App., 150 So. 98. The facts in that case do bear some resemblance to the facts in the present case. However, the marked and decisive difference in the cited case and the present case is the fact that in the cited case the court found from the testimony and opinion of the attending physician and supported by other proof that the deceased Allen had general septicemia resulting from the injury on his leg, and that the infection had entered the blood stream; that the prevailing medical opinion was to the effect that the appendicitis which the deceased developed was caused by the infection in the blood stream, or aggravated by that condition. In the present case, the evidence does not show that there was any infection in the blood stream of the deceased resulting from the injury, nor is there any reasonable or legally certain proof to show that there was any infection resulting from the injury that had any causal connection with the appendicitis.
In our opinion, the case of Scott et al. v. Baton Rouge Water Works Co. et al., La. App., 10 So.2d 528, is more similar in the factual situation to the present case than the Allen case. In the Scott case, we reached the conclusion that a serious and continuous injury and disability to the arm and shoulder of the deceased employee had no causal connection with an attack of appendicitis which developed some time after the injury but while the deceased was still disabled from the injury.
For the reasons assigned, the judgment appealed from is hereby affirmed.