. TATE, Judge.
This is a wrongful death action. The widow of Milton Thomas sues for herself and their six minor children. She alleges that her husband died on November 16, 1962 as a result of an accident three weeks earlier, and that this accident was caused by negligence for which the defendants are legally responsible. The trial court dismissed the suit, holding that an accident had not been proved and, further, that the preponderance of the medical evidence showed that the decedent’s death resulted from non-traumatic causes not at all related to the alleged accident.
The plaintiff-widow therefore appeals. The issues of the appeal are primarily factual.
1. Facts as to alleged accident.
As a result of the widening of U. S. Plighway 167, it was necessary for the Central Louisiana Electric Company (“Cleco”) to relocate its power lines paralleling the highway. Cleco therefore entered into a contract with the B & L Construction Company (“B & L”) for this latter firm to relocate Cleco’s power lines approximately fifty feet west of their old location. The alleged accident causing the decedent’s death is averred to have occurred as a result of negligence in the performance of this contract. B & L’s liability insurer and also Cleco itself are joined as codefendants herein.
In connection with the relocation of the power lines, it was necessary first to drag down the electrical transmission lines from the power poles at the former location. (Following this, the power poles were to be relocated at their new location further west, to permit re-stringing of the power lines.) In the course of this work, the power lines were hanging or lying near or on the ground, parallel to the main highway 167.
The incident giving rise to this litigation occurred when the decedent turned from the main highway 167 into a gravel-dirt side *393 road which entered the north-south main highway from the west. At this place, the uncharged power lines had been lowered parallel to the main highway, so as to lay completely across the side road, approximately 40-50 feet from its mouth as it was entered from the main highway.
The plaintiff contends that the decedent collided with the power lines as they hung, obscured in the dust, eighteen inches or more above the surface of the road, and that this caused a relatively severe impact between the lines and the car, as a result of which the plaintiff struck the interior surface of his vehicle and sustained injuries (bruises) which activated or caused a stress-ulcer from which the plaintiff died approximately three weeks later.
The defendants contend, on the other hand, as alleged in the answer of one of them, Tr. 37, that “there was no collision or accident of any kind involving the [uncharged] electric wire in question and the automobile of Milton Thomas and the extent of said occurrence was the wheels of the Thomas car merely rolling over or coming into contact with an electric wire which was lying on said road; that there was no damage of any kind either to said wire or to the Thomas car; that there was no collision, jarring, sudden stopping or other movement of said automobile which could have in any way caused any bodily harm or injury to the said Milton Thomas and respondent avers, therefore, that the said Thomas received no harm or injuries of any kind whatsoever to his body or to his automobile on said date at the location named in the petition.”
To prove her case, the plaintiff relies on the complaints of the decedent, at the time he reported to a physician four days after ,.the incident, that he had suffered contusions all over his body as a result of such impact. The plaintiff also relies upon the testimony of two alleged eye-witnesses who were approaching on the same side road as the decedent, and who allegedly saw his car strike the suspended wire and bounce back at an angle about three feet, and who' were allegedly present when the decedent claimed he had hurt himself in the accident when he bumped against the steering wheel. Due to certain inaccuracies in the testimony of these witnesses as compared with the actual physical facts of the accident, the trial court found their testimony to be unworthy of belief.
On the other hand, the trial court accepted the testimony of two of the contractor’s employees who were indeed present at the scene. These employees testified positively that the wires in question were lying flat on the surface of the side road, that the wires were lightly jerked when the decedent’s car ran over them, and that the decedent backed up at that time (possibly because he was uncertain whether or not the lines were charged with electricity).
One of these witnesses then went over and talked with the decedent. The witness reported at the time, and also testified at the trial to this effect, that he had asked the decedent if his car had been hurt or if he had been hurt, and the decedent replied, no. After he and the decedent inspected the car, they found no damage to it. The decedent then went on his way.
These two witnesses for the defendants also testified positively that no other car drove up, such as the one in which the plaintiff’s witnesses were allegedly approaching at the time of the incident.
 The trial court accepted the version of the accident given by these two defendants’ witnesses over the contrary version to which the plaintiff’s witnesses had testified. We find no error in its so doing. The evaluation of credibility is primarily within the province of the trier of fact, and such trier’s findings of fact should be accepted upon appellate review in the absence of manifest error. We find none here.
Therefore, we find that the evidence reflects only the decedent came into contact *394 with the wires lying flat across the road as he came to a stop, and that as a result he did not sustain any impact or jarring. We note that, immediately prior to its stop, the decedent’s car had just turned from the main road onto the side road, and he was therefore approaching at a very slow speed towards the wires, which were only some forty feet from the entrance onto the side road.
It must be admitted, as the plaintiffs able counsel argues, that some corroboration is furnished to the plaintiff’s version of the accident by the fact that the contractor’s employee went over to see if the decedent had been hurt by an impact, as well as by several subsequent circumstances:
... On the evening of the incident, the decedent did come to the supervisor of the construction crew and tell him that he had been hurt in the accident. Two or three days after the accident, an investigator for Cleco did contact the decedent and was told that the decedent had slipped on the corner of his car seat as a result of an accident and, as a result, had hurt himself in the groin and testicle. And, on approximately the day after the investigator interrogated the decedent (i. e., four days after the accident), the decedent did report to a local doctor with a history of a severe impact and with subjective complaints of pain and contusions over his chest, abdomen and testicles, as a result of which the decedent was hospitalized for treatment of these subjective complaints.
It can be argued that this behaviour after the accident, as well as the concern of Cleco in sending an investigator to obtain a statement, indicate that all the parties knew at the time that there was a more severe impact than that to which the defendants’ witnesses testified at the trial.. On the other hand, these subsequent complaints by the decedent (which naturally provoked the interest of an investigation by Cleco) are not inconsistent with tire decedent’s having magnified a possible tort claim, as an afterthought after the inci-’ dent, in connection with which claim the decedent retained an attorney within five days of the alleged accident.
We find no error in the trial court’s having construed the evidence as supporting the latter interpretation of the subsequent complaints and acts by the decedent. Corroborating a minimal contact with the wires rather than a jarring impact or stop are the circumstances: that there was no evidence that the decedent’s car had suffered the slightest dent as a result of the allegedly severe impact; that the decedent did not report to a doctor for treatment until four days after the impact (and then, as indicated by the date of the doctor’s written report to the decedent’s attorney immediately after the decedent’s admission, approximately simultaneously with the decedent’s retaining an attorney to represent him in a possible tort claim) ; and that, up until the decedent actually reported to the doctor, he was seen normally driving his car up and down the side road for two or three days after the accident.
2. Medical Testimony.
Because of the coincidence of the decedent’s death within seventeen days after his hospitalization for the allegedly traumatic consequences of the alleged impact, we have scrutinized with care the medical testimony in this record, to determine whether it corroborated the plaintiff’s version that the decedent had suffered a jarring impact from a sudden collision or stop. We conclude that it does not.
The plaintiff-appellant relies with considerable confidence upon the testimony of the attending physician. This expert medical witness felt that the decedent’s death was precipitated by the stress or worry of the accident described to him by the decedent. This physician felt that an emotional stress-ulcer can be activated by shock and trauma (“where extensive”, Tr. 316); that such occurred in this case; that the stress-ulcer could have caused the perforation or ero *395 sion of an artery, resulting in the massive hemorrhage from which the decedent died.
This physician’s evidence does indeed furnish strong circumstantial proof tending to corroborate the plaintiff’s position that the trauma of the accident of October 25th was much more severe than that to which the defendants’ witnesses testified.
According to this physician, the decedent came to him four days after the accident, complaining of troublesome pain resulting from severe contusions and a severe shaking up in the accident. The physician hospitalized the decedent and treated him for these complaints for seventeen days.
. On the day the decedent was to be discharged, he developed a massive hemorrhage while waiting in the doctor’s office, and the decedent died of this continuing hemorrhage the following day. Because of the massive nature and the color of the bleeding, the attending physician was certain that it resulted from erosion of an artery in the stomach region. He felt that the plaintiff had died of stress-ulcer, because this was the only possible cause he could imagine as a cause of such massive bleeding.
However, the strength of this physician’s testimony is weakened by several circumstances.
In the first place, when the decedent appeared at the physician’s office four days after the incident, there were no objective symptoms of contusions or injury. Tr. 317. Essentially, the physician hospitalized the decedent because of his subjective complaints of pain, and the only reason he assigned a causal connection of them to the accident was because the decedent described to him a much more severe impact than the actual evidence of the accident proves.
In the second place, the physician was not familiar with the decedent’s medical history, as to which detailed records were available at the trial from the charity hospital at which the decedent had been treated for several years preceding the accident, and which demonstrated that the'- decedent had been suffering from at least three serious conditions, any of which in themselves could have caused the erosion of the artery, and none of which under the uncontradicted medical evidence could have been aggravated or precipitated by a trauma such as the decedent described, let alone by the very slight incident which the evidence actually proves to have occurred.
In short, the evidence indicates that this physician’s supposition that the alleged accident could have caused both the decedent’s hospitalization and his death, was induced by this physician’s reliance upon (a) an erroneous factual description of the trauma given to him and (b) his having inadequate information as to the'decedent’s prior medical history.
Two other medical witnesses also testified, one a qualified specialist in the field of internal medicine, and the other a general surgeon with special competence (as instanced by publication of numerous articles in professional medical journals) in the diagnosis and causation of ulcers. Both of these witnesses testified solely from the medical records (a) of.the decedent’s various treatments from 1956 to 1959 at Lafayette Charity Hospital and (b)- of the patient’s hospitalization for the' 17 days immediately preceding his death' in 1962.
The charity hospital records revealed that the decedent had been hospitalized for a period and had been treated as outpatient numerous times from 1956 to 1959 for stomach complaints, during the course of which he vomited blood, evidenced blood in stools, etc. The hospital records indicated that the patient’s suffering and symptoms were caused by (a) an active gastric-syphilis, (b) liver atrophy, resulting perhaps from the syphilis or perhaps from an infectious hepatitis, which was also diagnosed, and (c) from a serious parasitic infection of the intestinal tract; as well as from (d) a possible ulcer. None of these conditions except the last were brought under control at the time the patient ceased going for treatment at the charity hospital, three •years before his death.
*396 These medical specialists, as a result of their examination of the medical charts in question, concluded that the massive hemorrhage from which the plaintiff died most probably resulted from the natural development of any one of the three first conditions noted, which a trauma could not accelerate or precipitate. They were also of the positive conclusion that, based on the records of hospitalization which showed slight discomfort and a normal diet and no complaints of stomach pain up until four days before the decedent’s death, development or precipitation of a “stress-ulcer” as a result of any trauma was medically impossible, because in the rare instances where such has been known to have been produced within three or four weeks of a trauma, there has always been “excruciating pain” (Tr. 205) or “a tremendous emotional strain”, “tremendous * * * suffering” (Tr. 545), as well as an onset of such symptoms immediately following the trauma.
The plaintiff-appellant complains, however, that the trial court erred in permitting these two specialists, who had never seen the decedent when alive, to testify over objection as to the probable causation of the decedent’s death, based upon medical and hospital records compiled during the course of treatment by other physicians and nurses. These hospital records were admitted into evidence, upon identification of their accuracy (a) by the attending physician as to his own hospital reports and (b) by certification by the charity hospital superintendent, of the charity hospital record and hospital chart, LSA-R.S. 13:3714. See McCormick, The Use of Hospital Records as Evidence, 26 Tul.L.Rev. 371 (1952); 6 Wigmore on Evidence (3d ed., 1940), Section 1707.
The trial court properly overruled the objection to the admissibility of the testimony of these medical witnesses. They were not improperly called upon to express their opinion as to the qualifications of another physician, as counsel alleges, citing Brabo v. Martin, 5 La. 275 (1833). Instead, the opinion testimony of these qualified medical experts was elicited to prove causation of the decedent’s death, and it was admissible and competent for such purpose, founded as it was upon admissible fact evidence in the record, such as the verified medical and hospital charts and records. 3 Wigmore on Evidence (3d ed., 1940), Sections 687, 688; McCormick, Direct Evidence of Medical Experts in Actions for Death and Bodily Injuries, 12 La.L.Rev. 264 (1952); Annotation, Expert Testimony — Basis, 98 A.L.R. 1109; 32 C.J.S. Evidence § 536.
A decision relied upon by the appellant, Allen v. Louisiana Highway Commission, La.App. 1 Cir., 150 So. 98, is not authority to the contrary: it simply demonstrates that such hypothetical testimony is admissible, but that the trial court may diminish the weight assigned to it, according to the circumstances.
Thus, the trial court here had to resolve the conflict between the opinion of an attending physician more qualified to testify because of his greater opportunity for more prolonged and more detailed observation of the patient, as against the opinions of specialists more qualified to testify to an injury within the field of their speciality by reason of their specialized study and experience.
In resolving such conflicts, “then the probabilities and improbabilities of their respective statements must be considered in the light of their capacity, opportunity or incentive for observation, the amount of corroboration, if any, and the degree of proof required,” Harris v. Argonaut Insurance Co., La.App. 2 Cir., 142 So.2d 501, 505. Further, “The duty of the court is to arrive at the actual truth of the questions involved, whether the disputed fact is sought to be proved by medical or lay testimony. In either case, the same rules apply as to the weight to be accorded the testimony. This weight is to be determined in the light of the witnesses’ opportunity for observation, their knowledge and experience, their cred *397 ibility, and the probability or improbability of their statements and opinions.,” Crenshaw v. Firemen’s Fund Indemnity Co., La.App. 2 Cir., 119 So.2d 663, 667.
Under the circumstances reflected by this case, we do not believe the trial court erred in according greater weight to the opinion of these specialists as to the cause of the decedent’s death, than it did to the opinion of the attending physician: The latter’s opinion was shown to have been founded on an incorrect and inadequate history furnished to him, and it was on the basis of such that he opined the decedent’s death had resulted from a rare medical condition, as to the cause of which the other medical experts were much better qualified to testify by reason of their specialized training and experience.

Decree.

For the reasons assigned, the judgment of the trial court dismissing the plaintiff’s suit is affirmed, at her cost.
Affirmed.