No. 3186

Second Circuit

## ARENDER v. GRANT TIMBER & MANUFACTURING CO., INC.

(June 28, 1928. Opinion and Decree.)
(November 8, 1928. Rehearing Refused.)

Kennon and Kitchens, of Minden, attorneys for plaintiff, appellant.

White, Holloman and White, of Alexandria, and A. L. Burford, of Texarkana, Ark., attorneys for defendant, appellee.

ODOM, J. A. W. Arrender was employed as a teamster by the defendant company.

On April 19, 1926, while at work and in the course of his employment, he was accidentally injured. He died on December 9th, following, or seven months and twenty days after the injury.

His widow, Mrs. Kate Arrender, for the use and benefit of herself and minor children, prosecutes this suit for compensation under the provisions of the Workmen's Compensation Law (Section 8 of Act No. 20 of 1914, as finally amended by Act No. 216 of 1924 and Section 8, general paragraph 2, Act No. 85 of 1926), which provides that:

"For injury causing death within one year after the accident there shall be paid to the legal dependents of the employee * * * a weekly sum as hereinafter provided."

Plaintiff alleges that her husband never fully recovered from said injury and that his death was due thereto.

The defense is that the injury neither caused nor contributed to the death of the deceased, but that he died from Bright's disease from which he had been suffering for some time prior to the accident.

Plaintiffs' demands were rejected by the lower court and she appealed.

## OPINION

Plaintiff's husband lived seven months and twenty days after he was injured, and during that time he went back to work for the same company, did manual labor for several months, and drew practically the same wages as she was getting when injured.

This fact, in connection with other circumstances which we shall refer to later, has given rise to the contention by defendant that the injury neither caused directly nor contributed to the death of plaintiff's husband.

On the other hand, plaintiff contends that her husband never fully recovered, and that even if it be true that the injury was not the direct cause of his death, and if it be found that he finally died from the effects of a disease which he had at the time of the injury and which was progressive in its nature and developed to a critical stage months after the injury, the injury accelerated and aggravated the disease, caused it to progress more rapidly and hastened the inevitable result, and that under such conditions and circumstances she is entitled to recover.

There is no point more clearly and firmly established by our jurisprudence as well as that of other states than this, that in suits for compensation under Workmen's Compensation Acts for death or disability, if it be shown that the injury complained of hastened death from a disease from which the employee was

suffering and from which he would ultimately have died, or if such injury aroused and caused to become active a dormant disease or quickened and accelerated an active, progressive disease from which disability results, it will be held that such death or disability was due to the injury and compensation will be awarded.

Behan vs. Honor Co., 143 La. 348, 78 So. 589, L. R. A. 1918F, 862; Craft vs. Lumber Co., 151 La. 281, 91 So. 736; Hicks vs. Meridian Lbr. Co., 152 La. 975, 94 So. 903; Donahoe vs. Scharfenstein & Sons, 154 La. 815, 98 So. 256; Durret vs. Woods, 155 La. 533, 99 So. 530; Hooper vs. Standard Ins. Co., 166 Mo. App. 209, 148 S. W. 116; Connell vs. U. S. Sheet & Window G. Co., 2 La. App. 93; Becton vs. Deas Paving Co., 3 La. App. 683.

But in such cases there can be no recovery unless the evidence establishes with some degree of certainty that there was some connection between the accidental injury and the death or disability as the case may be.

On this point the plaintiff has failed to make out her case.

The deceased was between fifty and sixty years of age and had been employed for something like three years by defendant, most of the time as a teamster, and drew or was drawing at the time he was injured $3.50 per day, and had worked regularly. He was driving a "four-up" team through the woods when one of the rear wheels of the wagon struck a bush or sapling and jerked it down upon his head and shoulder. He was picked up in an unconscious condition and carried to his home and a physician summoned. On the following day he was carried to Alexandria, and placed in a sanitarium where he remained for eight days, during a portion of which time he was irrational. He was carried back to his home where he remained in bed for one week, but, according to his wife, was sick for five weeks from the date of the injury. But she is probably mistaken as to the time, for he was injured on April 19th and went back to work in May.

The testimony shows that he worked six days in the last half of May, twenty-four and one-half days in June, nineteen days and six hours in July, twenty-four days in August, seven hours in September, nine days in October, and one day and three hours in November. During this period, that is, between the time he went back to work in May and the time he quit in November, the mill for which he was working was moved to Arkansas and he moved with it and worked there. He subsequently moved back to Louisiana and worked at Minden for the same company. Considering the time he lost in moving twice, he evidently lost but little time, if any, from sickness. When he was injured he was receiving $3.50 per day as a teamster. He returned to work as a "swamper" at $3.00 per day. His duty as a "swamper" was to use a club ax and cut out rights of way and help load logs on the wagons. He quit work in November and died December 9th.

In support of her contention that deceased never recovered from the injury, plaintiff introduced testimony tending to show that while he worked several months after the injury he was not able to perform heavy manual labor, and cites the fact that after the injury he drew only $3.00 per day whereas before he drew $3.50.

We are not impressed with this theory. Using an ax, cutting down trees, and loading logs requires strenuous physical exertion more so than driving a four-mule

team, in which process the driver usually rides one of the mules, as deceased seems to have been doing when injured.

Plaintiff also brought on witnesses who swore that deceased complained of pains in his head and neck after he went back to work. But this is disputed by other witnesses who worked with him and who said they heard no such complaints.

In support of its contention that the injury had no connection with the death and that the death was due to a disease which was not in the least accelerated by the injury, defendant cites the fact that deceased went back to work after the injury, and did hard manual labor for several months, and called several physicians who testified as to the deceased's condition at the time he was injured and as to the cause of death.

Dr. D. V. Donaldson, who attended deceased about 10 o'clock in the morning of the day he was hurt, said he was told that deceased had been injured by a bush or sapling, but he paid but little attention to that, but found later some evidence of a lick on the head and neck, and that the patient was under shock caused by the blow. He went back the following day and found that the patient had not made satisfactory progress and he called in Dr. Packer of Alexandria. He and Dr. Packer had the patient sent to a sanitarium where they made an examination and found that the patient's then condition was caused by nephritis or acute Bright's disease and they treated him for high blood pressure. He did not think the blow was sufficient to cause any serious results.

Dr. Packer said that upon examination he found evidence "of a minor injury on the top of the right shoulder and the top of the head," but did not think the injury was sufficient to produce the condition in which he found the patient. He took his blood pressure, which was extremely high, examined his urine, the kidneys, and had a chemical analysis of his blood made. The chemical examination of the blood showed:

"* * * a retention of urinal nitrogen more than three times the normal amount. This showed that it must have accumulated over a long period of time. The P. S. T. test, kidney function test, showed the first hour forty, for the second hour ten, or fifty total in two hours; normally it would be eighty-five, or more than one-third of the whole kidney tissue destroyed."

In speaking of the patient's condition, Dr. Packer said that in his opinion the injury had nothing to do with his condition, as it was slight or of a minor nature, and the findings show:

"* * * much of a chemical condition—that is, the Bright's disease would explain every condition the patient had, without resort to supposition that a minor injury had anything to do with his disability."

He was asked what he had to say as to whether the injury was a—

" * * * moving or accelerated cause of the death of Mr. Arender."
and he said—
"My opinion is that it had absolutely nothing to do with it."
and that if the patient had received a brain injury, it would have produced different results—

"* * * a possible paralysis on one side."

He gave it as his opinion that the patient's convulsions were caused by uremia.

Dr. F. R. Hill said, conceding that the patient had Bright's disease, the blow or injury was not a moving or accelerating cause of his death, and that if the injury had amounted to anything it would have had its effects at once.

"I could see no connection between the injury and his death."

He said uremia and high blood pressure usually brought on convulsions, and—

"After uremic convulsions and the progression to that stage, usually from six months to two years, a person will die."

Dr. R. O. Simmons was called in consultation while the patient was in the sanitarium in April. He says he made a thorough examinatiion and found he was unconscious, pulse pounding, and—

"I found that he had a slight little brush wound, if I mistake not, on the back of his right shoulder, I think his right shoulder, and he had a little bruised place on the back of his head—slight."

He saw that the blood count and blood pressure were taken, looked over the urinalysis, and—

"I fully made up my mind that the man was a very sick man for some time previous to my seeing him * * * My opinion was that this man was suffering from chronic nephritis of a very advanced stage, probably had it for a number of months or possibly a number of years * * * He had blood pressure * * * 280 * * * or 140 * * * diastolic * * * urine showed some blood."

And in summing up his diagnosis, he said:

"He was suffering from a chronic nephritis that had been aggravated by a general toxin, as a result of an increased urina in the urine. In other words, he was poisoned; had a general poisoning."

Which, he said, means Bright's disease.

Asked what was the cause of the convulsions, he said:

"Due to uremic poisoning, to a profound intoxication in the blood."

Asked whether the blow could have caused the convulsions, he said:

"Well, my opinion is this, that if he received a sufficient blow to have caused these convulsions, already having been a doomed man with his suffering from severe kidney lesion, I think he would have died right away; within a few days at the outside."

Dr. J. B. Benton attended the patient during his last illness. He found him suffering from high blood pressure and chronic Bright's disease of advanced stage.

Dr. A. B. Creed saw the patient the day he died and said that the cause of death was—

"Cerebral hemorrhage, apoplexy, ruptured blood vessel."

None of the physicians who saw and treated the patient were impressed that the wound on the head, neck or shoulder was of a serious nature. The x-ray showed no injury to the skull or brain. These physicians were of the opinion that the shock from the wound may have had something to do with bringing on the convulsions immediately following, but that the effect of the shock soon passed and had no connection with his ultimate death.

Dr. Reagan and Dr. Crutsinger were called by plaintiff as experts. They did not see the patient. They were asked hypothetical questions in which the condition of the patient from the date of the injury to the date of his death was exaggerated or overstated, and asked whether the injury had any connection with the death, Dr. Reagan finally said:

"I will answer this in this way. That is the sound medical reasoning everyone has and we know that an injury may cause death after a year but certainly within less than a year it is well to give the injury due consideration as a cause of the trouble."

Dr. Crutsinger, after hearing a detail of the wound and the patient's condition, by counsel for plaintiff, said:

"* * * the accident is undoubtedly involved in that death."

Dr. Benton, who attended the deceased in November previous to his death in December, found the patient suffering from chronic Brights' disease and high blood pressure of long standing, and said, from the history of the case he had received, he thought the blow on the head was a factor

in the death but did not believe it was the direct cause; and asked if the April 19th injury hastened his death, he said, "Yes, sir, I do."

The testimony of the last physicians named was purely technical, based not upon what they knew from personal examination but from what they were told as to the conditions.

We think the opinion of the physicians who personally attended the deceased and knew his condition from first hand information is entitled to more weight than that of those who never saw him.

Our conclusion, reached from reading and considering all the testimony, is that the injury of April 19th had no connection whatever with the death on December 9th.

Judgment affirmed with costs.