No. 4205

Second Circuit

(Second Division)

## HILL v. MERIDIAN FERTILIZER FACTORY

(February 16, 1932. Opinion and Decree.)

G. Randall Whitmeyer, Barksdale, Bullock, Warren, Clark & Van Hook, Irion & Switzer and Thomas M. Comegys, Jr., of Shreveport, attorneys for plaintiff, appellee.

Thatcher, Browne, Porteous & Myers, of Shreveport, attorneys for defendant, appellant.

TALIAFERRO, J. Plaintiff was injured, while in defendant's employ, by a cake of hardened commercial fertilizer sliding down the side of a large pile thereof, striking his right leg violently above the ankle, and causing a complete fracture of the internal malleolus. The blow knocked plaintiff down and unconscious for a short time. He was immediately carried to a physician, who had an X-ray made of the wound, reduced the fracture, put on a splint, and provided him with crutches. This doctor continued to treat the wound and, after two months, discharged the patient. Union of the bones was then complete, but there was not complete ossification. Plaintiff was advised to make use of the injured limb as a means of hastening ossification. No further trouble from the fracture was experienced, and when the case was tried it was pronounced in satisfactory condition.

Plaintiff brings this suit to recover compensation for said injury and alleged results thereof. The gravamen of his action is expressed in paragraph IV of the petition, which we quote, viz.:

"IV. That as a result of said accident and injuries, petitioner has suffered a severe and permanent shock to his nervous system; that he is afflicted with violent trembling and becomes highly excited on slight provocation; that he suffers constant nervous twitching and trembling of the muscles in all parts of his body; that he is afflicted with sleeplessness and is unable to get proper rest, due to his nervous condition; that he has virtually no control over his muscles, nerves or limbs, all a direct result of said accident."

He further alleges that said fracture has not properly healed; that his leg continues to pain him severely, and he fears and believes that same will never heal; that he has been rendered permanently and totally unable to do any work of a reasonable character.

Defendant admits employment and wages of plaintiff as alleged by him, but denies all other allegations of the petition, except as to its corporate capacity.

There was judgment for plaintiff for $9.75 per week, during disability, not exceeding 400 weeks, less a credit of $370.50 (38 weeks' compensation paid). Defendant has appealed.

Plaintiff suffers from a disease commonly called shaking palsy (Parkinsonism), which affects his head. His contention is that this affliction is an effect following and caused by the blow that fractured his leg, while defendant insists that he was so affected before the injury and the condition has not been aggravated thereby.

The following quotation from the lower court's reasons for judgment correctly states the law applicable to the contentions of the parties, viz.:

"Plaintiff is either suffering from a functional disease brought about by trauma, or he is suffering from a true shaking palsy, which is an organic disease and has no connection with the trauma which he received, or he is suffering from true shaking palsy, an organic disease, aggravated by the trauma which he received. If he is suffering from functional shaking palsy, brought about by the trauma, he is entitled to recover. If he is suffering from a true shaking palsy, aggravated by the trauma which he received, he is entitled to recover. If he is suffering from true shaking palsy which he had prior to the accident, and

which has not been aggravated in any way by the trauma, he is not entitled to recover."

The evidence establishes beyond any question that before being injured plaintiff was a healthy, stout man, and a good worker. It also establishes that this condition has changed, and he is not now able to do manual labor of a reasonable character.

A large number of the witnesses, including many sworn for defendant, testified that he was not the strong, healthy man he used to be, and looked different to what he formerly did.

At the time of injury he was performing the heavy work of shoveling commercial fertilizer into a car and shoving the heavily loaded cart to an elevator. Prior to this service with defendant he worked on the highways of Caddo parish and farmed.

Some fifteen lay witnesses, who were acquainted with plaintiff, testified on trial of the case specifically with regard to tremor of his head prior to time of his injury. There is wide variance between some of them.

Five white men, including a former foreman of defendant, two storekeepers, a mail carrier, and one farmer, and three colored men, all well acquainted with plaintiff, testified that they never noticed anything wrong with him and never observed any shaking of his head. A road construction foreman of Caddo parish, under whom plaintiff worked in 1922, remembered that at that time plaintiff's head was given to shaking. Seven colored witnesses testified that prior to his injury plaintiff's head would shake. Some of these say it shook "a little," while others say you had to notice closely to observe it. Two other colored witnesses, co-laborers with plaintiff when the accident happened at defendant's plant, testified that plaintiff's head would shake as much before as after the injury. One of defendant's foremen testified that plaintiff looks better now than he did prior to the accident, but he never noticed that plaintiff's head had tremors. Mr. Thayer, defendant's superintendent, testified that before the accident plaintiff was nervous, shaky, and weak, and was given only light work, and concludes by saying he was in better condition physically at date of trial than before he was injured. It is well to remark here that, as to the latter statement, this witness is contradicted by over a dozen witnesses, including several of defendant's.

Plaintiff's testimony supports the allegations of his petition as to the effect the injury from the falling cake of fertilizer had upon his body in general. He states that he cannot walk far without becoming tired; that walking causes him pains that run up his right leg and side; that he has not perfect control over the movements of his right leg, arm, and side; that these parts of his body "shakes a whole lot," and "as time goes on it gets badder and badder"; that he cannot sleep on the right side on account of its nervous tendencies; that his appetite is not good and he is weak physically; that the nervous condition with which he is affected manifested itself after the injury.

Several physicians testified in the case, on each side, including nerve specialists. We will give a resume of some of their evidence as far as we deem needful for the purpose of throwing light on the issue of whether or not plaintiff's condition is traceable to the injury causing the fracture of his leg.

The lower court, before trial, appointed Dr. D. L. Kerlin to make an examination of plaintiff and report his findings. He did so. This report reads as follows:

"I do not find any evidence of organic disease of his nervous system. He presents certain objective nervous symptoms, viz.: course tremor of muscles of entire right side of body and head, and some muscular weakness of right side. In my opinion these symptoms are purely hysterical in character, and are caused by a desire for compensation."

Dr. Kerlin did not testify as a witness in the case. The report is ex parte.

Dr. A. A. Herold, a nerve specialist of many years' experience, made two examinations of plaintiff; the first in December, 1930, and the second five weeks later. He found muscular weakness and tremor, on right side of body, right leg, and arm, which the patient seemed unable to control. These were the only objective symptoms noticeable.

He found more or less general physical weakness in plaintiff. Dr. Herold diagnosed plaintiff's trouble as traumatic hysteria, resembling Parkinsonism. He had doubt as to whether the disease was traumatic neurosis, hysteria brought on by trauma, or the true condition known as Parkinsonism, which is organic in nature, following the disease known as encephalitis (sleeping sickness). He doubted it being Parkinsonism, as plaintiff had no history of having had encephalitis. His opinion was that the trouble was functional, not organic, as only the nerves were involved, not the nerve centers. That the condition was involuntary with plaintiff, and while it may be produced by either physical or psychic trauma, he thought, in this case, it was caused by the former, in view of the patient's low mentality; that the injury received by plaintiff when his leg was fractured was sufficient to bring about the condition he found him in, and worry and nervous strain would affect it too; accelerate bringing it on in addition to the original physical shock; that traumatic hysteria did not mean imagination, but meant that the nervous system has had a jar sufficient to impair the function of the nerve trunk. He did not think there was good nutrition of all parts of plaintiff's body. He said no one could tell if plaintiff's ailment will improve, or whether it will last him through life. His condition had not improved any from the first time Dr. Herold examined him to the time of trial. He was certain plaintiff is not a malingerer. It is unusual for one of his mentality to be one.

The foregoing is the substance of Dr. Herold's testimony as a witness in behalf of plaintiff. He was also called to the stand as a witness for defendant. In order to have the full benefit of his evidence on the pivotal issue involved, we quote salient parts of it:

"Q. And suppose that a person has a little tremor that is hardly perceptible and meets with an accident, such as you know that this plaintiff met with, is it your opinion that that trauma might aggravate the tremor as it existed?

"A. Yes, sir.

"Q. Well, let us suppose that tremor exists in a person, very slight, so slight that it is hardly noticeable with ordinary observation, and then that person meets with an accident such as the plaintiff in this case met with; that nervous symptoms immediately develop noticeable to anybody and everybody, particularly practitioners of medicine, would you say that the trauma has had the effect of aggravating the tremor or the condition, whatever it was, that existed prior to the accident?

"A. Yes, sir.

"Q. It makes no difference whether it precipitates, in the first instance, a tremor or aggravates one that previously existed, the effect is about the same, if it has a very aggravative effect?

"A. Yes, a shock, as I said yesterday, will very frequently bring on tremor if one pre-exists. Of course it would be more liable for it to be exaggerated afterwards because of the fact that is the weak point of the system.

"Q. The trauma, in other words, would be more likely to have the effect of aggravating the condition that existed than creating a condition that did not exist to start with? That is true, isn't it?

"A. Yes.

"Q. Would the assumption that the plaintiff in this case had a very slight tremor, such as I have described to you, militate against your diagnosis that he is now suffering from traumatic neurosis, with the case presented to you as it has been?

"A. He could have a combination of the two conditions. He could have chronic encephalitis and with tremor interposed upon top of it. * * *

"Q. That condition, if it existed, could be very much aggravated and usually would be aggravated by trauma such as this plaintiff received?

"A. What I mean, the symptoms of it. This tremor could be aggravated by injury.

"Q. Yes, and the other disease could co-exist along with the encephalitis?

"A. Yes.

"Q. You have no reason at this time, with the case before you as it is, to change your diagnosis that he has traumatic neurosis, have you, Doctor?

"A. Well as I said yesterday my diagnosis was based upon the physical findings and history. We have to go by both, we cannot go entirely and simply by examination. We have to depend to a large extent upon the history in making a diagnosis and it all depends in my mind as to which is the correct history. There seems

to be some divergence of opinion here. I mean by that some have said that he had this tremor, as I understand, before; some have said that he did not have it. If he had the tremor before, the probability is that he has encephalitis.

"Q. At the present time?

"A. At the present time. He could have both conditions, as I say.

"Q. If we assume, for the sake of argument, the history as being correct, that he had slight tremor before the accident, would you say that his present condition is traumatic neurosis as well as encephalitis?

"A. Yes, sir."

The impression we get from Dr. Herold's testimony, as a whole, is that, if plaintiff did not have tremor prior to his injury, then his present condition is attributable to the effects of the injury; and if he did have slight tremor before he was injured, then most probably the condition has been aggravated as an effect of the injury. The fact that plaintiff's condition since the injury has become pronounced, so much so that it is easily observed by those he contacts with, supports the opinion expressed by Dr. Herold.

The testimony of Dr. Roy C. Young was taken under commission. He is also a nerve specialist. He made physical examination of plaintiff in December, 1930, and expressed the opinion that plaintiff is suffering from an early stage of true shaking palsy, an organic disease. He does not think it was caused or brought about by the accident to plaintiff. He did not testify as to whether or not the trauma exaggerated the condition he found in plaintiff.

It is made certain by the evidence that it is possible that functional shaking palsy could be originated by a fall and injury

such as plaintiff experienced; and it is equally certain that, if he was affected by slight tremor of the head prior to the accident, such condition could have been aggravated by the fall and injury. In either case, as well said by the lower court, plaintiff is entitled to recover. It is equally certain that, whatever plaintiff's condition was when injured, it is much worse now, so aggravated that he cannot do manual labor to any great extent. It is also fairly well established that, if plaintiff was affected by slight tremor prior to the accident, such condition was not nearly so noticeable then as now.

In the course of his reasons for judgment, the lower court said:

"In our view of the case, it makes no difference whether the plaintiff was suffering with a true shaking palsy prior to the accident or not, although we are inclined to the view that he did have this in an incipient stage at that time.

"The report of Dr. Kerlin is directly contradicted by the testimony of Dr. Herold, who was a witness for both the plaintiff and the defendant, and by the testimony of Dr. Young, a witness for defendant.

"Under the report of Dr. Kerlin, we think that plaintiff would be entitled to recover, under the authorities in this state. Under the testimony of Dr. Young, if the trauma had no aggravating effect on the plaintiff (a matter on which Dr. Young does not testify) he would not be entitled to recover. Under the testimony of Dr. Herold, given both as a witness for plaintiff and as a witness for defendant, we think the plaintiff is entitled to recover. The testimony of Dr. Herold given as a witness for plaintiff was based on the assumption that plaintiff did not have a true organic shaking palsy prior to the accident; and that on that assumption, he was now suffering from a functional shaking palsy, which is a true disease brought about by the shock from the trauma. On this theory, plaintiff would undoubtedly be entitled to recover. Under our view of the testimony given by Dr. Herold on cross-examination, and when placed upon the witness stand by the defendant, he testified that, even if the plaintiff was suffering from a true organic shaking palsy prior to the accident, in his opinion, the accident undoubtedly aggravated this prior condition. * * *

"While Dr. Herold does not say that the shock from trauma would necessarily aggravate a previous condition of an organic disease, if the conclusion is reached that such condition is much worse after the accident and nothing tangible is presented as a cause for same except the trauma, then one must conclude that the trauma was the cause. And such a condition is much more likely to follow in a highly neurotic type, and Dr. Slicer, a witness for the defendant, testified that this plaintiff was of that type."

We adopt these reasons as containing correct deductions from the evidence and conclusions of law appropriate to same.

It has been held by many decisions of our courts that, if an inactive or latent disease is aggravated or accelerated by trauma, which causes it to flare up and become active, producing disability, the employee is entitled to the benefits of the Workmen's Compensation Law, the same as he would be if the primary injury alone had caused the disability.

"To recover compensation, employee's continued disability need not have directly resulted from injury; disability because of condition arising from injury or contributed to thereby being sufficient." Anderson v. La. Oil Ref. Corp., 16 La. App. 294, 134 So. 343; Blackman v. Hope Engineering & Supply Co., 11 La. App. 92, 120 So. 682; Arender v. Grant Timber & Mfg. Co., 9 La. App. 132, 119 So. 498.

We are of the opinion that the judgment appealed from is correct, and we hereby affirm it.