HARDY, Justice.
This is a compensation case in which plaintiff employee seeks recovery against his employers and their insurer for total permanent disability. After trial there was judgment in favor of plaintiff awarding weekly payments at the rate of $28.73 for the period of disability, not to exceed 400 weeks, from which judgment defendants have appealed.
As the basis of his action plaintiff alleged that in or about the middle of the month of March, 1954, he became affected with what appeared to be a drawing sensation of the right side of the neck, which subsequently developed into uncontrollable jerking movements of the head; that his affection was first diagnosed by his consulting physician as myositis and possible traumatic arthritis of the cervical muscles and spine; that subsequently the condition was diagnosed by a number of neurosurgeons as spasmodic torticollis, and that his resulting disability, which he claimed to be permanent and total, was “caused, precipitated, aggravated, triggered and invited by the work which he was performing * *
From some time in August, 1953, until the discontinuance of his employment on or about April 15, 1954, plaintiff was employed as a ripsaw operator by Richland Furniture Dimension Plant. As a possible explanation of causal connection between his employment and the development of the spasmodic torticollis, plaintiff’s petition alleged :
“That in operating the saw in order to observe and operate the regulating lever or guide which regulated the size of the finished pieces of the material which he fed into the saw, petitioner of necessity held his head continuously and rigidly turned to the right, which resulted in a constant strain and tension on the muscles, nerves, bones, tissues and tendons of his neck.”
This case does not concern the occurrence of any “accident” as the term is customarily understood. There is no contention of any sort of traumatic injury and it is clear that plaintiff’s claim to recovery of necessity must and does depend exclusively upon a connection between his occupational employment and the aggravation or exaggeration of his disability as the result thereof which has been so comprehensively enunciated by the wording of his petition as first above quoted.
It is further to be observed that the conclusion of this case must ultimately be resolved upon the basis of the medical testimony incorporated in the record before us since, as above noted, there is no contention of any traumatic injury or any other nature of accident in the customary and accepted understanding of the term. The relevancy of the lay evidence therefore is concerned only with the facts surrounding *455 plaintiff’s employment and the development of the physical affection, about neither of which, fortunately, is there any material conflict.
In the performance of the duties of his employment plaintiff was engaged in the dimensional cutting of small boards of varying widths. The physical and mechanical features in connection with plaintiff’s operations have been impressively illustrated in the instant case by the introduction of motion pictures, as well as still photographs demonstrating the operation of the mechanical appliance in the sawing of boards designed for use in the employer’s furniture manufacturing business. Admission in evidence of the pictures tendered by defendant met strenuous objection on the part of counsel for plaintiff in the trial court, which has here been re-urged. We think it proper to dispose of this objection before proceeding further with this opinion.
The learned judge of the trial court correctly overruled the objection. It is true, as urged by plaintiff’s counsel, that the pictures offered in evidence demonstrate the operation of the saw under somewhat different circumstances and by a person other than the plaintiff. However, the purpose of the exhibits was not intended to simulate the operation as performed by plaintiff but was designed to reflect the nature of the machinery and the ordinary method of operation.
We think counsel’s objection goes to the weight rather than the admissibility.
As was said by Mr. Justice Simon in the opinion of the Supreme Court in State v. Palmer, 227 La. 691, 80 So.2d 374, 382:
“In this modern era it has been universally recognized that courts must take judicial cognizance that all civilized communities must perforce rely on photographic pictures in presenting inanimate, natural and physical objects and resemblances of persons. * * * In determining their admissibility, proper inquiry should be made to ascertain whether such evidence would clarify some material issue and would afford the court and the jury a clearer comprehension of existing physical facts and throw greater light and more accurate appreciation of the weight, if any, to be given the oral testimony.”
In our opinion this use of the medium of visual impression in this case has been a source of greater enlightenment to the court than any number of printed pages of descriptive matter, and there has been not the slightest prejudice to plaintiff.
The pictures to which reference has been made indicate that an employee engaged in the work required of plaintiff generally took a position facing the metal table supporting the mechanically operated ripsaw; that quantities of small boards were stacked by a fellow employee on the table to the left of the operator’s position; that the operator reached to his left, procured a board, placed it on the guide, adjusted a dimensional gauge which was located slightly to his right on the surface of the almost waist high table, and after adjusting the gauge to the required measurement then forced the board through the saw, following which it was carried to the opposite end of the table where it was received by the employee charged with the duty of “tailing” the saw, who, if necessary, returned the board to the sawer by sliding it down the table to the sawer’s left-hand side. This operation was constantly repetitious and it is established that for the greater part of the time plaintiff was employed in this operation, between August, 1953 and March, 1954, the nature of the operation of the employer’s business required the frequent changing of the dimensional gauge which would, in fact, require plaintiff to keep his head for considerable periods of time in a fixed position, turned down and to the right from the normal level. However, it is also established that this operation did not require, as was alleged by plaintiff in his petition, a persistently rigid position of the head and neck, but was frequently relieved by the necessity for turning to the left. It is noted that the contentions of plaintiff’s counsel have been somewhat adapted to the establishment of this fact in that now it is contended that both the rigid position of plaintiff’s *456 head and neck for considerable periods of time and the repetitive turning to the left and back to the right are connected with and contributed to the development of his affliction.
As above stated, plaintiff first noticed a feeling of tautness of the neck, accompanied by a drawing to the right, sometime during the month of March, 1954. At first plaintiff dismissed his feeling of discomfort on the assumption that he was suffering from a “crick” in the neck, but the condition grew worse and plaintiff reported the matter to his foreman and requested that he be temporarily shifted from his work as sawyer. The foreman complied with this request and plaintiff was given other work for a day or so, but it appears that the change did not effect any material improvement, and, in plaintiff’s own words, it seemed to help only “a little bit”. Upon being shifted back to his work as sawyer plaintiff’s condition steadily deteriorated, but he failed or refused to consult a physician, despite the importunity of his wife and the suggestion of his foreman. Plaintiff’s employment was discontinued on or about April 15, 1954, but it was not until May 10th, that he first consulted a physician, Dr. Norman Booker, who was practicing in Many, Sabine Parish, Louisiana. Dr. Booker diagnosed plaintiff’s condition as myositis and treated him for a period of several weeks, during which time plaintiff’s condition grew more acute. Later plaintiff was hospitalized in the Confederate Memorial Hospital in Shreveport for approximately a month and on a return visit for a period of some four days.
Plaintiff was examined by Dr. John B. Sutton, a neurosurgeon in Shreveport, on June 2, 1954, at which time his condition was diagnosed as spasmodic torticollis, and it was following this examination and diagnosis that plaintiff was admitted to the Confederate Memorial Hospital on June 8th, where he remained until July 6th. In October, 1954, the plaintiff went to the New Orleans Charity Hospital where he was examined in a neurological conference, following which surgery was recommended. The surgical operation was carried out in two stages, the last operative procedure being performed on October 27, 1954. None of these treatments nor operations were effective, and we think there is no possible question as to the correctness of the conclusion that plaintiff is permanently and totally disabled.
The defense to plaintiff’s action has resolved itself into the contention that plaintiff has failed to establish either a causal connection between his employment and his affection or the aggravation or exaggeration of his physical condition by reason of his employment, incurred In the course and scope thereof. This point constitutes the only issue which is here presented for determination.
The record before us is preponderantly made up of the testimony and depositions of medical experts, all of whom, with two exceptions, are eminently qualified in the highly specialized and steadily developing field of neurology and neurosurgery. On behalf of plaintiff there was tendered the testimony of Dr. Norman Booker, who was first consulted on the occasion we have above discussed. Dr. Booker, a general practitioner, himself conceded his limitation by reason of the fact that he was not a specialist in neurology. Plaintiff also tendered the testimony by deposition of Dr. Ford J. Macpherson, a highly qualified and reputed orthopedic surgeon of Shreveport. The testimony of this witness is predicated entirely upon research and study of spasmodic tor-ticollis, and his testimony disclosed that his information was obtained and his expressions of opinion were based almost exclusively upon text book study, undertaken at the request of plaintiff’s counsel.
With due respect to the outstanding qualifications of the above named medical witnesses, we are not disposed to accord any considerable weight to the effect of their testimony with reference to the instant case, by reason of the fact that we are firmly convinced that plaintiff’s disability falls exclusively within the realm of neurological specialization.
Testimony of experts in the field of neurology was introduced on behalf of defend *457 ant by testimony on trial of Dr. Dean Echols of New Orleans, and on behalf of plaintiff by the depositions of Drs. John B. Sutton and Heinz K. Faludi of Shreveport and Dr. Faviss D. Kimbell, Jr., of New Orleans.
The analysis and correlation of the testimony of these neurological specialists result in the determination of some areas of complete agreement, which we proceed to set forth.
Spasmodic torticollis may be defined as an affection of the muscles and nerves of the neck, evidenced by reflex spasms of jerking motions of the head and neck to one side or the other. In the instant case the spasms directed the motion to the right. The progressive nature of the affection is evidenced by an increase in the frequency and severity of the spasmodic movements. Medical science has been unable to ascertain or assign the cause of the affection. The disorder is now attributed to either the effect of a degenerative process in the brain, a basal ganglia or lesion, or to a psychogenic condition which may be hysterical in origin. Upon these broad general principles the opinion of the medical witnesses in the instant case appears to be unanimous. It follows, in view of the fact that the cause of the affection is unknown, that there can be no possible justification for a conclusion that plaintiff’s occupation caused his disability. Our consideration, therefore, is limited to a determination of the validity of plaintiff’s contention that his occupation contributed or exaggerated or aggravated his pre-existing condition, and to this determination we address ourselves by proceeding to the careful consideration of the testimony of the experts.
Dr. Sutton was the first neurological specialist to examine plaintiff, and, upon the basis of his examination, he diagnosed the condition as spasmodic torticollis. With reference to the possible relationship between occupation and disability we quote the following extracts from the testimony of this witness:
“Q. Is it generally conceded by the medical profession or generally thought by the medical profession that this pathology is at least partly due to or the basis of it is sometimes neurotic or psychogenic? A. That is my understanding.
“Q. Doctor, do you think that there is also some physical basis for this disease or this pathology? A. There are certainly physicial manifestations in the form of abnormal movements resulting from a peculiar and abnormal type of contraction of certain muscles, but what the cause of this contraction is I do not know.
“Q. Doctor, in your experience and in your studies is it the opinion of the text writers and of yourself that one possible cause for this condition is occupational, in that a person say doing this type of work that this man was doing, keeping his head turned rigidly to the right much of the time or turning his head repeatedly to the right during a long period of time, that that in itself would be one of the causes of the onset of the disease or onset of the symptoms, or at least a precipitating factor in it? A. I believe that, I think many writers of textbooks believe that this may be a precipitating factor or that the condition may manifest itself during such experience.
“Q. Doctor, by stating that in your opinion you think that this is a precipitating factor in many instances, with the history as given you by this patient of not having had any neck pathology or any symptoms of the disease or any symptoms of spasmodic torticollis prior to the onset of symptoms in about the middle of March or the first of April of 1954, at which time he had been in this occupation where he had to turn his head to the right for some eight or nine months, would you think that in this patient that this work was a precipitating cause of the symptoms ? A. I think it is very possible probably.
“Q. Doctor, in questioning some of the other medical witnesses in this *458 case it has been developed that there are two possible schools of thought in regard to spasmodic torticollis and its etiology; one that the disease is psychogenic in origin or may be, and the other that it is organic in origin or may be, or a combination of the two. Now, •is it possible to tell in a given patient whether or not the disease is of psychogenic origin or of organic origin? A. I don’t believe it is possible to tell in an early case where the torticollis itself is the only manifestation whether or not it is entirely psychogenic or whether other symptoms and manifestations may later develop suggesting an organic basis.
“Q. As I understand your answer on that, in your opinion to properly make a diagnosis of spasmodic torticol-lis being of organic basis it would be necessary that you have other manifestations of an organic disease, is that about it? A. I would say that in order to make any very definite statement that it was organic and due to organic brain disease one would have to have other manifestations. But since the etiology or cause is still really unknown, and as far as I know even the organic pathology described has not been strictly proven to be a cause by anybody, it would be hard to answer the question definitely.
“Q. Doctor, if a patient were predisposed toward spasmodic torticollis, would activity in his occupation, such as the history given to you by Mr. Sparks, in your opinion, be, as you put it in your report, almost an invitation to the onset of these symptoms? A. I would think so.
“Q. And I believe you stated that in your opinion also a precipitating cause for it? A. I believe that it could be in a person with a latent tendency to this condition.
* * * * * *
“A. Again I will have to say that the cause is not known, and that any disease in which the cause is not known usually many possible causes will be mentioned in textbooks and by individuals privately, and certainly without proof of this being a possible cause— that this is not a possible cause I could not say that it wasn’t.
“Q. Doctor, in the absence of proof of other causes or precipitating factors of this condition, would it be unreasonable to assume that this man’s occupation in which he so nearly imitates the movements of spasmodic tor-ticollis was the precipitating factor in this man’s pathology ? A. I think it is reasonable to believe that it may have been a contributing factor.”
Dr. Heinz K. Faludi first saw plaintiff in a neurological conference at which he was presiding after plaintiff’s admission to the Confederate Memorial Hospital in June, 1954, and later he saw him in his office on November 29, 1954. We quote pertinent extracts from Dr. Faludi’s testimony as follows:
“Q. I see. Now, Doctor, is it the feeling also of the medical profession generally, or at least in your field, that if the torticollis is caused by an organic disturbance, such as basal ganglia, is it a mono-symptomatic thing, or is there generally, if that is what causes it, more than one symptom? A. Yes, sir. Usually if there is an organic cause in the basal ganglia there is a more widespread symptomatology. We practically never see just one symptom alone from basal ganglia disease, the one symptom being the torticollis. There are usually additional manifestations.
“Q. In this case, Doctor, did you find any other manifestations of basal ganglia? A. No, sir, this patient had merely the involuntary movements of the neck.
“Q. Based on that, Doctor, would you say that, in your opinion, this thing was on a hysterical basis rather than on the organic disturbance? A. Mr. Edwards, I believe if we say *459 ‘hysterical’ that’s putting it a little bit too narrow.
“Q. Well, let’s make it this way; on a psychogenic basis rather than— A. I would think that it would be in favor of a psychogenic basis.
******
“Q. Now, Doctor, based on your education, experience in the field, and the lectures you have attended and so forth, in your field, do you feel that in the instant case the history given you by the patient, that being that he, in his occupation, more or less imitated the movements of the torticollis? In other words, he stood at a saw turning his head to the right practically all day long, sometimes for long hours during the day, over a great period of time; do you feel that that was, or may have been, the initiating factor, or the trigger mechanism that brought about the torticollis in this man? A. I will say this; the repetitive motion that this patient had to make during his occupation may have led to a habit, a habit spasm, a habit of turning the head practically mechanically or suggestively, and if this patient was predisposed originally to some personality disorders, which so far have not been uncovered on this patient, then it may have been that this occupation precipitated this torticollis.
* * * * * *
“Q. Now, Doctor, as I understand your testimony, if I may sum it up very briefly, as I understand your testimony, it is to the effect that inasmuch as this man performed repetitive movements in his occupation, that the occupation could possibly have caused the condition from which he is suffering. Is that it? In other words, you say there is a possibility that the condition was caused by his occupation? A. No, I didn’t say it was ‘caused’; I still can’t say that.
“Q. If that’s incorrect please correct me. What I am trying to get is exactly how you word your opinion as to relationship? A. Well, I feel that the cause is unknown. Nobody will be able to give you the cause, I don’t think. But I felt that this patient may have precipitated the onset of his torti-collis on account of his work. I will say that presupposes that he is somewhat inclined to be suggestive, because there are a lot of people who work and do repetitive movements without getting torticollis. In other words, if we say that we have to presuppose that this patient is inclined, has an underlying personality disorder that came to the fore on account of these suggestive repetitive movements, and I believe that is the most likely reason in this case.”
Dr. Faviss K. Kimbell, Jr. of New Orleans first observed plaintiff during the month of September, 1954, upon entrance to the Charity Hospital in New Orleans and subsequently performed two operations in an unsuccessful attempt to alleviate plaintiff’s condition. With reference to the connection between plaintiff’s occupation and disability, Dr. Kimbell testified:
“Q. Doctor, in your research on this point, or in your studies involving this pathology, do you find that the textbook writers on clinical neurology list as one of the causes or aggravating factors of the disease, occupations such as was held by this man? A. The statement that occupations sometimes contribute to, sometimes cause the disease is in the textbooks. I do not recall the specific mention of this type of work, but they do mention occupational causes as one o-f the etiological factors in the syndrome of torti-collis.
“Q. And you agree with that statement, Doctor? A. Well, I think that is very likely true, because it has been seen and reported in medical literature in fifteen or twenty years.
“Q. In the occupations which they refer to, would you 'think in your experience and from your reading on it, that the type of occupation which this *460 man was actually doing is the type of occupation to which the literature refers? A. I would think that very likely, yes, that is true. They were referring, in a general manner, to any type of occupation where a person is required to use his head and turning in various positions.
* * * * * *
“Q. And if this man’s onset of symptoms occurred while he was working and after he had been doing so for some period of time, is it your opinion that the work was an aggravating factor in bringing about the disease, is that correct? A. Well, with certain restrictions. I feel that his disease had existed or tendencies for the disease to develop were perhaps enhanced by his occupation, but I feel that he would have developed it regardless of what type of occupation he was doing. Now, I feel he had an organic central nervous system lesion which would have made it appear no matter what occupation he followed.
“Q. Doctor, as I understand your testimony on that point is that he would, in all probability have had it at some later date anyway, but, due to his occupation, that it brought it about more hurriedly? A. Well, I cannot say that is the case, because if he had been in another type of occupation, he may have had it at the same onset in the same chronological order of his age or he may not have; no one can say.
“Q. In your opinion, in this case, isn’t it right that in your opinion, he would in all probability have had it anyway, but since he was in this occupation and turning his head, as he was, that it brought it about sooner than it probably would have resulted? A. I say it is possible, but I cannot say that with validity that it would come on sooner because no one can, because the best we can talk about and judge is from the events in the past reports on this disease. I feel that the occupation aggravated the condition and made it appear at the time it appeared.
“Q. Because of the occupation? A. During the occupation, but I cannot say whether it would not have come on later or at the same time in another occupation; no one can, really.
******
“Q. Doctor, let me ask you one question; for clarification, when you stated before that some writers in the field of neurology have stated that occupations have been found to be a cause, do you feel that occupation in itself can be the sole cause of this man’s condition? A. In this particular disease?
“Q. Yes. A. Let me answer it this way: that the organic type which is — by that I mean lesion within the brain stem or the brain itself — I think is not caused by occupation; but the hysterical type which you have spoken of — whether one is the cause of the other or the effect, or vice versa, it’s a hard one — but I think there is a direct relationship in the functional or hysterical type being caused by occupation.
“Q. Now, just one more question on this hysterical type, Doctor. We said before that in the hysterical type of spasmodic torticollis, it is usually found that the man is predisposed to this condition, by that I mean it is reasonable to assume that this man is emotionally involved in some serious prior to the onset of the symptoms, is that correct? A. If you are assuming a hypothetical case, that’s correct. Of course, it should be corroborated, proven medically by a psychiatrist for psychiatric evaluation, but in the literature that is reported, that very sequence that you mentioned. Usually, it is either constitutional things that had been there all his life, that have been dormant, appear at that time, but events or factors in the environment in the past brought up to it could trigger it off.”
*461 Dr. Dean Echols, a most eminent neurosurgeon of New Orleans, examined plaintiff on July 22, 1954, in his office in the Oshsner Clinic. The testimony of this witness and his opinion is somewhat more positive than that of the other experts and we quote some of the significant extracts from his testimony:
“Q. What was your diagnosis of this condition? A. The diagnosis is spasmodic torticollis.
“Q. That is a well defined condition, is it not? By that I mean it is ■discussed or mentioned in various books on medicine or neurology? A. Yes, spasmodic torticollis is a fancy word for twisting and jerking of the head to ■one side and has been a well known ■disease entity for probably a couple of hundred years and is in every text book on medicine and neurology that exists.
“Q. Doctor, Mr. Sparks filed suit for workmen’s compensation benefits alleging that he commenced work as a rip saw operator in August, 1953, and I will quote from his petition:
“ ‘That in operating the saw in order to observe and operate the regulating lever or guide which regulated the size of the finished pieces of the material which he fed into the saw, petitioner of necessity held his head continuously and rigidly turned to the right which resulted in a constant strain and tension on the muscles, nerves, bones, tissues and tendons of his neck.’
Assuming those facts to be true, Doctor, is there in your opinion any connection between Mr. Sparks’ occupation and his condition known as spasmodic torticollis ? A. It is my opinion that in the case of Mr. Sparks, and all the other cases of spasmodic torticollis, •there is never any relation between ■the occupation and the torticollis.
“Q. Doctor, will you please tell the court what in your opinion causes torti-collis, and, secondly, why you feel it is not related to a man’s occupation?, A. It is generally agreed among the neurologists and neurosurgeons in this country that spasmodic torticollis is due to inflammatory or degenerative changes in the extracranial system of the brain. It is true there may be some hysterical cases of torticollis that imitate the true disease. But all cases of torticollis, in my opinion, are due to physical changes in the brain.
“Q. Due to physical changes as distinguished from psychogenic causes? A. Yes.
“Q. In other words, from hysteria? A. Yes.
“Q. Doctor, isn’t it a fact that spasmodic torticollis cases are found in all areas of the world ? A. I can’t say for sure, but so far as I know they occur in every nation of the world.
“Q. Cases are found that are widely separated, are they not? A. The disease is rare in that practically all cases are widely separated. Two in a town would be quite a phenomenon.
******
“Q. Doctor, cases of physical conditions which are caused by psychogenic reason or cases of hysteria!, the emotional conflict the person has, are they usually of some magnitude? A. They are always of great magnitude.
“Q. Such as? A. Well, such things as hysterical blindness or hysterical deafness, paralysis, numbness of the hand and almost every disease there is can be imitated by. a person who is hysterical, but those serious things, blindness and deafness, are always produced by deep-seated emotional conflicts and emotional conflicts due to sex and dread maybe; and hysteria is never produced by trivial matters or both-: ering with his job and so on.
******
“Q. Doctor, is this spasmodic torti-collis a rare condition or something you see a great deal of? A. It is a rare condition.
*462 “Q. You have engaged in the practice of medicine for how long? A. Since — well, have been strictly in the field of neurosurgery since 1935.
“Q. And in that length of time, Doctor, approximately how many cases of this condition have you seen? It wouldn’t have to be exact, just approximately. A. Well, I have seen three or four cases on the streets in New York and one in New Orleans and several in Europe; but I can safely say under oath that I have seen not less than twenty personally as patients.
“Q. You would say it is a very rare condition then ? A. Yes.
“Q. If it were related to a man’s occupation, wouldn’t you expect, with the number of assembly lines working in the country, that it would be very prevalent or at least prevalent? A. Well, yes, it seems to me so many occupations turn the head continuously, like an engineer on a locomotive, looking back at his train, and building automobiles, the assembly lines turn their heads all day. I would think half the country would have torticollis if it is connected with the occupation.”
To us it is most significant that none of the experts, with the possible exception of Dr. Echols, were willing to express any opinion as to the relationship between plaintiff’s occupation and his physical affliction except in the most carefully qualified terms.
Viewed in the light of an interpretation which would be most favorable to plaintiff’s contentions, we are still faced with the obvious fact that the affirmance of his right to recovery in the instant case could only be supported upon the shaky foundation of mere probability. We are fully aware of the principle of the qualified nature of opinion evidence, particularly with respect to the testimony of medical experts diligently urged by learned counsel for plaintiff, upon the basis of Sharp v. Esso Standard Oil Co., La.App., 72 So.2d 601, the opinion in which referred to Larsen’s Workmen’s Compensation Law, Volume 2, Section 80.-32, page 322. As a general rule the more able and highly qualified, the more impressive the reputation and distinction of a medical witness, the more reticent he appears in the expression of an unqualified conclusion. Nonetheless, we think we would be going far afield, and would be establishing a dangerous precedent, if we were to conclude in the instant case that a relationship between occupation and disability has been established in fact only upon testimony of a highly speculative nature, couched in the most carefully guarded language of “mays” and “mights”.
We are further cognizant of the fact that in the instant case where we are dealing with a little known and less understood physical affection of rare incidence, admittedly originating from causes unknown, that the opportunity for the production of convincing testimony is extremely limited. But again we are constrained to resolve that the undue relaxation of the accepted requirements of legal proof is not justified simply by the limitations of scientific knowledge.
The factual circumstances of the instant case remove it from any analogy to Taylor v. Mansfield Hardwood Lumber Co., La.App., 65 So.2d 360; Hill v. Meridian Fertilizer Co., 19 La.App. 29, 139 So. 498, 499; Biggs v. Libbey-Owens-Ford Glass Co., La.App., 178 So. 639, and other similar cases in which there was evidence of an accident involving some form of traumatic injury or physical strain.
In a recent case involving an injury in the course of employment allegedly resulting in disability which also fell within the specialized province of neurology, Roberts v. M. S. Carroll Co., La.App., 68 So.2d 689, 690, we found it necessary to reject plaintiff’s claim on the ground that the only support for his position was found in possibilities and probabilities. Our reasons as stated in the cited case are entirely appropriate here.
Adding to the existing vagueness and uncertainty which precluded the expression of positive opinions by the medical witnesses was the suggestion advanced in the *463 testimony of some of them that plaintiff’s condition indicated the need for psychiatric examination and diagnosis. This in itself is additional evidence of the remote and speculative nature of the contended relationship between plaintiff’s employment and his disability. This recommendation by some of the witnesses constitutes in itself a clear indication of the impossibility of a satisfactory explanation either as to causation or aggravation of plaintiff’s condition.
For the reasons assigned the judgment appealed from is reversed and set aside and there is now judgment in favor of defendants rejecting plaintiff’s demands.