McBRIDE, Judge.
This is the second occasion this workmen’s compensation suit has been before us. After trial in the district court, plaintiff’s claim for benefits under the Workmen’s Compensation Law, LSA-R.S. 23:-1021 et seq., were denied on the ground that the statutory provisions were inapplicable to her, and on plaintiff’s appeal to us we affirmed the judgment and held that since plaintiff was employed wholly in the nonhazardous portion of her employer’s business, she was not covered by the provisions of the Act (92 So.2d 730).
Plaintiff made application to the Supreme Court for certiorari, which was granted, and ultimately the Court, after reviewing the case, reversed the judgments of the district court and this court and held that under the existing jurisprudence of this state the plaintiff was covered by the provisions of the Workmen’s Compensation Law. The Supreme Court remanded the case to us for a determination of the other issues raised by the pleadings (234 La. 1075, 102 So.2d 461). The case is now before us on said remand, and the only question involved which requires our decision is the nature or extent of the injuries sustained by plaintiff.
Plaintiff was a woman 63 years old when the accident befell her on October 14, 1954. She was then employed as an in-spectress by the defendant hotel corporation, and during the course of her occupational duties, in attempting to step out of an elevator, she stumbled and fell against a bed stored in the passageway sttstaining a cut on her left shin and slight injuries to her head and arm. She stated the head and arm were “all right” at the time of the trial below.
Plaintiff insists her left leg, as a result of the accident, is in a weakened condition at the present time, and she is unable to return to her employment of inspectress in the hotel because she had charge of about one hundred rooms and the duties of the *123 .job require that she stand most of the working day which she cannot do. She stated:
" * * * j just crumble down sometimes when I am walking, just crumple down to the floor it is so weak, and sometimes I can’t even pick it up, and it drags.”
Plaintiff is now employed as manager of a guest house in New Orleans which consists of fourteen rooms, the occupants of which are weekly or monthly tenants. She pointed out that she is able to carry on this occupation as she is not required to stand for any considerable period and may place herself in a sedentary position when her leg troubles her. Her present work, therefore, is of a different character than that she formerly carried on.
Plaintiff concedes that for thirty years before the accident due to some sort of previous accident or malady, the nature of which she was unable to explain, she had a stiffening of her left hip and as a result ■of this she limped perceptibly on the left leg. She testified “the ligaments or something drew up back there.” This previous ■condition existing in her left leg, according to plaintiff, did not inhibit her even partially from carrying on her job as in-spectress in the hotel and she worked under no handicap whatever, suffered no pain, and experienced no inconvenience. The record would seem to bear out all this in that the plaintiff was capable of working for the hotel corporation for a number of years. It is reasonable to suppose that had the limp affected her ability to carry on her occupational duties, her employer would have terminated her services. There was no attempt made to show her employer ever complained of or manifested any dissatisfaction with plaintiff’s work.
The plaintiff maintained her previous condition was rendered considerably worsened as a result of the accident in the hotel. She points out that while she did limp for many years, her leg was not in the weakened condition it presently is, and since the accident she has been dragging her foot and has had to employ the use of a walking cane. She states, also, her limp has become accentuated and upon changes of atmospheric conditions, her leg feels as though it were “artificial” and there is hardly any sensation or circulation in it.
After her accident plaintiff was treated in the office of Dr. J. T. Scott, Jr., now deceased, who was the employer’s physician. When first seen there on October 18, 1954, she was complaining of an open wound over the left shin bone which had been sustained in the fall at her work a few days previously-
Although sixteen members were on the staff at Dr. Scott’s office, none of these physicians were called as defense witnesses, and the only evidence emanating from Dr. Scott’s office is a statement signed by Dr. Scott himself under date January 7, 1955, submitted to the employer’s insurance carrier, as follows:
“X-rays revealed no bone injury and she was treated the next four weeks with terramycin ointment and allowed to continue work. However, when seen on November 16,1954, it was noted that she was getting no better and that the circulation in her leg was poor as evidenced by varicose veins. At this time it was decided that, due to circulatory situation, the only way we could get this ulceration healed was to get her off her feet and she was told not to work. The wound at this time had developed into a chronic ulceration and she was advised to use Bacetracine soaks four times a day at home and given a prescription for vitamin C to augment wound healing.
“During the subsequent five and a half weeks the wound slowly progressively healed under this treatment. We would like to note that this location is one of the slowest healing areas of the body, especially in an elderly person with a circulatory deficiency, and that the ordinary methods do not suffice.
*124 “Mrs. Luce was seen on the 27th. of December at which time the wound was completely closed. She was given a felt pad to wear over this area to protect the new skin for a week and was discharged from our care.”
As her medical expert plaintiff produced Dr. Blaise Salatich, conceded by counsel to be a qualified orthopedic expert. This physician did not have occasion to treat plaintiff, and his testimony pertains to his examinations of her made on two occasions. He first saw the plaintiff on May 20, 19S5, and again on April 24, 1956. Dr. Salatich testified the conditions he found on his second examination were the same as he had found the first time he saw the patient, and that during the interval between the examinations no significant change in her condition took place. He stated throughout his testimony that the plaintiff complained of persistent and somewhat consistent deep-seated aching-type pain of the lower leg with instability of the limb, and that located on her left shin was a discolored irregular-shaped healed scar measuring approximately three inches in length; there was generalized soft tissue thickening and tenderness was present over the region, including “deep soreness” over adjacent portions of the leg. Dr. Salatich states plaintiff was fully cooperative throughout the two examinations, and he believes plaintiff’s complaints of pain would be compatible with the conditions he found, and when interrogated as to whether he thought the plaintiff would be able to perform the duties of an inspectress which required her to be on her feet for long periods of time, he stated that the plaintiff must be considered a poor candidate to perform such occupational duties and he considers her totally disabled from performing them as a result of direct trauma. He based his findings on the subjective symptoms given him by the plaintiff and also on the objective symptoms his examinations disclosed. Dr. Salatich’s testimony with reference to the discolored scar runs thus:
“That is considered a tender scar for two reasons. One reason is that soft tissue following direct trauma, heals with a certain amount of sensitivity, deep and superficial. Two, the location of the scar, right adjacent to-the shin in a superficial area, which normally is considered a painful area (if one strikes their shin the general area is quite sensitive) so based on the location and the involvement, it is sensitive. One would have to say that the residual of that is painful.”
Dr. Salatich’s explanation of plaintiff’s residual disability was:
“Residual disability, according to Mi's. Luce’s history of persistency of complaints, including my examination, would be persistent pain, persistent weakness of the limb, persistent instability of the limb, persistent requirement of support with a cane, per-sistency of tenderness and persistency of discoloration of the soft parts that would be the basis for residual disability, embracing disfunction and pain.”
He in effect stated that the fact the plaintiff had been able to work in the hotel notwithstanding the previous limp demonstrated to him that she could not have suffered any appreciable amount of pain or discomfort from the pre-existing condition.
The defendants also called a medical expert, namely Dr. Irving Redler, an orthopedic surgeon, who, like Dr. Salatich, examined plaintiff at a time remote from the-accident. Dr. Redler saw the plaintiff on August 26, 1955, and found on her left shin a purplish discoloration but that the skin, other than the discolored portion, “looked” like the rest of the skin on the-leg. He attached no significance to the-discoloration. He had X-rays made, but he could find no evidence of any injury either to flesh or bone or any objective-symptoms, and his conclusion was the patient had recovered fully from the effects- *125 of the injury she sustained in the fall, and that she was physically capable of resuming her former type of work. Dr. Redler concedes plaintiff complained to him of constant pain in the shin, and that she also told him the leg felt like “it was going to give way.”
Nothing in Dr. Redler’s testimony could be construed as a direct opinion of the physician that the complaints of plaintiff are not consistent with her present condition. While Dr. Redler manipulated the skin on plaintiff’s shin she complained of considerable pain, but Dr. Redler never once stated he thought her claims were not genuine, nor did he state that it was unlikely that that pain would emanate from the discolored area on the shin. He never explained why the injured area should have remained discolored so long after the accident.
Plaintiff impresses us as having testified honestly and fairly and we have no reason to brand her testimony as being unworthy of belief or to discard it and accept Dr. Redler’s testimony instead. The plaintiff has never attempted to return to her former employment, and we think there is justification for this, being convinced she could never stand on the leg for such long periods as her job required.
We notice that the report that emanated from Dr. Scott’s office over Dr. Scott’s signature makes no mention that plaintiff was not suffering from pain or that she could return to work. Dr. Scott stated “she was discharged from our care,” but the report tends to indicate that at the time of the discharge plaintiff’s injuries might not have completely healed, for we find that Dr. Scott stated she was given a felt pad to wear over “this area to protect the new skin for a week.” We gain the impression the medical discharge was premature.
This appears to be a case where the preexisting condition of the left hip had nothing to do with plaintiff’s present inability to carry on her previous employment duties, and we do not think her present incapacity was the result of an acceleration of the dormant condition which had posed no handicap to plaintiff’s performing her work in the hotel competently and satisfactorily. Her incapability to return to work resulted solely and only from the trauma on the lower portion of the leg.
However, even if it could be said that the previous condition of the hip has some causal connection with plaintiff’s inability to do work of a reasonable character, then this would be a clear case where an accident to a worker had the effect of aggravating a pre-existing physical condition which, under the settled jurisprudence of this state, would entitle plaintiff to all of the rights and benefits of the Workmen’s Compensation Statute. Picquet v. Toye Bros. Yellow Cab Co., La.App., 77 So.2d 569; Buxton v. W. Horace Williams Co., 203 La. 261, 13 So.2d 855; Hill v. Meridian Fertilizer Factory, 19 La.App. 29, 139 So. 498; Grober v. Grace Logging Co., 18 La.App. 185, 137 So. 613; Broussard v. Union Sulphur Co., 5 La.App. 340.
In either event this present plaintiff must be considered as totally and permanently disabled, and we hold she has proven her case adequately and cannot be denied the benefits provided by the Statute.
Plaintiff has prayed that in the event she recovered judgment, defendants be assessed with a penalty of 12 percent of all amounts due, both in principal and interest, under LSA-R.S. 22:658, but we do not consider this to be a matter in which the court should penalize the defendants for the stoppage of payment of compensation to plaintiff. The defendants acted on the report of their medical expert, and there is nothing indicating they attempted to take advantage of plaintiff or arbitrarily cut off any benefits she was legally entitled to receive. Penal and punitive statutes are not favored by the courts and it would be entirely inequitable, under the facts of this case, to allow this plaintiff to recover the statutory penalties.
*126 Therefore, for the above reasons, it is ■ordered, adjudged and decreed that the judgment appealed from be amended so as ■to provide that the plaintiff have judgment •against the defendants, in solido, for workmen’s compensation at the rate of $16.50 .per week for a period commencing October 14, 1954, and not exceeding 400 weeks, subject to a credit, however, of compensation for 9 and %ths weeks (at the same rate) which has heretofore been paid her, 'all unpaid installments to bear interest at the legal rate from maturity until paid;
It is further ordered that the fee of plaintiff’s attorney for a sum not to ex■ceed $1,000 be approved;
Defendants are condemned to pay all •costs incurred in the lower court and the ■costs of this appeal.
And as thus amended, the judgment appealed from is affirmed.
Amended and affirmed.